(No. 44893.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. RONALD OWENS, Appellant.

*Opinion filed November 15, 1976.*

R. Eugene Pincham and Theodore M. Becker, of Becker & Tenenbaum, both of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, and Laurence J. Bolon, David A. Novoselsky, and Bertina E. Lampkin, Assistant State's Attorneys, of counsel),. for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

A jury in the circuit court of Cook County found defendant, Ronald Owens, guilty of the murder of Curtis Butler. The circuit court denied post-trial motions for a new trial and arrest of judgment and sentenced defendant to the penitentiary for not less than 14 nor more than 20 years. Charging error of constitutional dimension, defendant appealed directly to this court (Ill. Const. 1870, art. VI, sec. 5). While the appeal was pending defendant filed, in the circuit court, a petition under the provisions of the Post-Conviction Hearing Act (Ill. Rev. Stat., ch. 38, par. 122—1 *et seq.*). This court ordered that proceedings in the appeal be stayed pending the adjudication of the post-conviction petition and that in the event post-conviction relief was denied, the appeal, if any, be consolidated with the original appeal. The circuit court, upon allowance of the People's motion, dismissed the post-conviction petition without a hearing and defendant appealed.

We consider first the issues raised in the original appeal and specifically defendant's contention that the evidence failed to prove him guilty beyond a reasonable doubt.

Robert Butler, brother of the deceased, Curtis Butler, testified that at approximately 6:30 p.m. on December 23, 1969, he and Curtis went to a grocery store in the vicinity of Marquette Road and Ashland Avenue in Chicago to cash their mother's paycheck. The store was crowded, and Robert waited outside while Curtis went into the store. As he stood outside the store, Robert observed a group of "about five guys" approaching from the north, along

Ashland. They arrived in front of the store at approximately the same time Curtis came out, and the Butlers walked south toward the corner with the group of young men. Curtis stopped to light a cigarette and Robert walked a short distance ahead of him. When he noticed that Curtis was not with him he turned back toward him. He heard one of the members of the group ask Curtis "Is it a game?" and Curtis responded that it was a game. The youth who had asked the question then pulled out a gun and said "Keep walking." He repeated the command several times, but Curtis refused to move. Defendant, who was standing closest to Curtis then said "Get your ass going." Curtis turned toward defendant, and defendant struck him in the face with his right fist. Robert heard defendant say to the boy who had drawn the gun, "Shoot him, shoot him, shoot that nigger." Two shots were fired. Curtis grabbed his shoulder and ran past Robert. Robert was dazed for a "couple of seconds," and when he realized what had occurred everyone seemed to have disappeared. He ran after Curtis, who had run about a block from the scene of the shooting and had fallen in the snow. Apparently he died at the point at which he collapsed and fell.

Ranson Brown, called by the People, testified that he worked at a laundromat at 6649 South Ashland. On December 23, 1969, he had closed the laundromat between 6:30 and 7 p.m. and was standing by the front window using the telephone when he saw defendant and five or six other boys walk past the laundromat in a southerly direction. Approximately "eight or eleven minutes" after he had seen the group of boys, he saw the defendant, who was "crippled and limping," running north at a slow pace. He testified that he had known defendant by his nickname "Trey" for five or six years because he frequently came into the laundromat with his mother when she did her washing. He was interviewed by police officers investigating the case that same night.

Robert Butler testified that his attention had been

drawn to defendant when he first saw the group of boys because he was the tallest among them. At one time during the occurrence he had stood within four feet of defendant. The shooting took place in a well-lighted business district, and the snow on the ground reflected the light. He testified that defendant was wearing a light-colored coat, probably beige. The day after the shooting he identified defendant from a photograph. Although the testimony shows that defendant was born with only two fingers on his right hand (the three missing fingers being the basis for the nickname "Trey"), was clubfooted, and had had polio as a child, Butler, in his description of defendant, made no mention of any noticeable distinguishing features except his height. Butler testified that the police came to his mother's house on Christmas Day and asked him to come to the police station because "they were going to have a lineup of some guys and they told me that the man I described as Robert [*sic*] Owens would be there." He stated that he viewed a three-man lineup at the station and picked out the defendant twice, once with glasses, and again after having him remove them. Butler acknowledged that the boy whom he identified as defendant had not worn glasses at the time of the shooting. He denied having identified anyone else at the lineup. The record shows that the "lineup" to which Butler referred was not the usual lineup but consisted of his viewing defendant and two other boys in a room at the police station.

Defendant testified that Sergeant Bisek, a Chicago police officer, stopped at his father's home and left a phone number for him to call. He called Bisek, who told him that there "was a misunderstanding that he wanted to get straightened out." Defendant, accompanied by his brothers, Alfred Elmore and Gregory Jones, went to the police station, where Sergeant Bisek told him that he had bad news for him and "We got a warrant on you for murder." Defendant denied any participation in the occurrence and requested that he be given an opportunity

to be viewed by any witnesses to the shooting. Defendant testified further that approximately one half hour later Robert Butler was brought into the room where he, Alfred Elmore, and Gregory Jones were seated. Butler pointed at Gregory Jones. A police officer took Butler from the room, and upon his return Butler pointed at defendant. Alfred Elmore's testimony corroborated that of defendant. At the time of trial Gregory Jones was in the United States Marine Corps stationed at San Diego and did not testify.

Defendant presented an alibi defense. He testified that in the early afternoon of December 23, 1969, he and his two stepsisters, Kathleen and Patricia Jacobs, had picked up defendant's girl friend, Sylvia Gant, and had bought groceries for his stepmother. On the way back to his father's home defendant's car became stuck in the snow. The four of them returned to his father's home at approximately 3 or 3:30 p.m. From that time until 7 p.m. they watched the movie "King of Kings" on television. Sometime during that period he had called an acquaintance, Emmett Ousley, on the telephone, and upon Ousley's arrival at his father's home, he and Ousley had stood in an outside hallway and discussed several matters, including the possibility of retrieving defendant's car. After watching "King of Kings" defendant played cards with his family and Sylvia Gant, and later watched another television movie.

Defendant testified that he had left his father's house only three other times that day. At some time between 7 and 9 p.m. he went to a neighbor's house to see if he could find a way to take Miss Gant home, since his car remained stuck in the snow. That visit took "five or six minutes." At about 9 p.m. defendant and Miss Gant went to a nearby store to buy snack food. They returned to defendant's father's apartment and remained there for approximately an hour or two. The last trip of the day was to take Sylvia Gant home. Having been unsuccessful at getting his car free or securing someone else's aid, defendant and Miss

Gant attempted to find a taxi. While trying to find a taxicab they came to the laundromat where Brown was employed. Although Brown was reluctant, defendant persuaded him to let them in to use the telephone to call a taxi and, while Sylvia called, he spoke with Brown. At that time Brown told him that someone had told him (Brown) that there had been a shooting.

Defendant also testified that he had club feet, had been a polio victim as a small child and because of his deformity was unable to make a fist with his right hand. He walked with a limp and was unable to run well.

Defendant's father and stepmother, Ernest and Flora Mae Jones, Mrs. Jones' daughters, Kathleen and Patricia Jacobs, and Sylvia Gant testified concerning defendant's trip to pick up Miss Gant and to buy groceries, as well as his presence at his father's apartment during the afternoon and evening. They testified that they too had watched "King of Kings" until 7 p.m. Emmett Ousley testified that following a call from defendant he had gone to defendant's father's apartment and that he had engaged in conversation with defendant in the hallway outside the apartment. Sylvia Gant's account of the trip home, including the conversation with Ranson Brown, was substantially as defendant related it.

In rebuttal, the People called the office manager of WLS TV, Channel 7, who testified that according to official logs, prepared by her, the showing of "King of Kings" ended at 5 p.m. and that there was no movie shown on Channel 7 between 5 and 7:30 p.m. on December 23, 1969. Nick Crescenzo, a Chicago police officer assigned to investigate the homicide of Curtis Butler, testified that he had gone to the home of Ernest Jones, defendant's father, at 8:30 p.m. on December 23, 1969, and was told by Ernest Jones that defendant was not there and that "he hadn't seen him that night." Joseph Barrett, a Chicago detective, testified that he saw Ernest Jones at his home at approximately 9:30 a.m. on December 24, 1969. He stated

that "I told Mr. Jones I was looking for Ronald Owens, and he stated that he didn't know where he was at. He stated he hadn't seen him all evening and possibly we could locate him at his place of employment."

We find apposite here our statement in *People v. McDonald*, 62 Ill. 2d 448, 456, that "it is the function of the jury to pass upon a question of an accused's guilt, and we will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the accused's guilt. (*People v. Stringer*, 52 Ill. 2d 564, 568; *People v. Peto*, 38 Ill. 2d 45, 49.) We cannot say the evidence in the record before us raises a reasonable doubt of the defendant's guilt."

Defendant contends next that certain of the circuit court's rulings were erroneous and so prejudicial as to require reversal and remandment for a new trial. He contends that the circuit court erred in admitting into evidence three black and white photographs which depicted the wounds suffered by the deceased. He argues that because a "life and death" witness testified to the fact of death, and a pathologist testified to the cause of death, the photographs were without probative value and could serve only to arouse and inflame the emotions of the jury. The photographs were used by the pathologist to explain the wounds suffered by the deceased, were clearly relevant to prove facts in issue and the circuit court did not err in admitting them. *People v. Henenberg*, 55 Ill. 2d 5.

Defendant contends next that two comments made by the circuit court, one in the course of ruling on an objection during defendant's cross-examination of Robert Butler, and the other while admonishing defense counsel during cross-examination of Ranson Brown, demeaned defense counsel in the eyes of the jury, to defendant's prejudice. While cross-examining Butler defense counsel sought to read to the jury Butler's testimony before the grand jury. This was done in an attempt to show that Butler had not testified that defendant had told the boy

with the gun to shoot the deceased. The People objected and the court, in ruling on the objection, said:

> "THE COURT: Objection is sustained. There is nothing in the questions and answers, counsel, that can be construed as impeaching.
>
> I will sustain the objection."

Defendant contends that the ruling was error, and that even more prejudicial than the erroneous ruling on the evidence was the court's comment on the evidence.

During the cross-examination of Ranson Brown the court, in admonishing defense counsel, said:

> "THE COURT: First of all, there is no need for you to shout at the witness. And there is no need for you to badger the witness. Counsel knows how to ask a question, and that is not a proper question and not the right tone of voice."

From our examination of the record we conclude that in the context in which they were made neither comment was prejudicial to defendant or demeaning to defense counsel.

Concerning the question whether the circuit court erred, when during Butler's cross-examination it refused to permit defense counsel to read his grand jury testimony to the jury, we note that the parties are in agreement that Robert Butler did not, before the grand jury, testify that defendant told the person holding the gun to shoot the deceased. The rule applicable to impeachment by proof of failure to state a fact on a prior occasion was stated in *People v. Henry*, 47 Ill. 2d 312, 320-21:

> "It would appear that no prior inconsistent statement in the usual sense was involved, but inconsistency in the literal sense is not always required for impeachment. In *Carroll v. Krause*, 295 Ill. App. 552, the witness testified that an auto in which the plaintiff was riding had but one headlight. At an earlier inquest the witness omitted mention of the fact of a single headlight. It was held that the prior statement was admis-

sible for impeachment purposes, though the witness had not been asked specifically about the auto's headlights at the inquest. The court said at page 562: 'The rule is that the omission of a witness to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact. 70 C.J. 1061; Greenleaf on Evidence (16th Ed.) Vol. I, sec. 462a.' Where, as here, it is claimed there has been a material omission of matters contained in a prior statement from later testimony it is logical that the fact of such omission should be admissible. Wigmore says: 'A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the nonexistence of the fact.' (Wigmore on Evidence, (3rd ed. 1940), sec. 1042); see also, McCormick on Evidence (1st ed. 1954), sec. 34; *Erickson v. Erickson and Co.,* 212 Minn. 119, 2 N.W.2d 824.) It would have been natural for the witness to have told in her testimony of the claimed coercion."

The circuit court did not err in refusing to permit defense counsel to read further from the transcript at the time when he attempted to do so. It did, however, err in sustaining an objection to a proper question propounded by defense counsel which would have laid the foundation for reading as impeachment the portion of the transcript to which defendant refers. The record, however, shows that enough of the transcript was read to the jury so that it was adequately apprised of the omission during Butler's prior testimony and we hold that the error was harmless.

Contentions similar to those made concerning Butler's testimony before the grand jury are also made in defendant's brief in connection with a narrative statement apparently made by Butler to a police officer and

introduced at the coroner's inquest. The statement is not in the record and we do not consider the arguments relevant to it.

Defendant contends next that by reason of trial counsel's incompetence he was denied the effective assistance of counsel. He argues that counsel's incompetence is demonstrated by his failure to file a motion to suppress Butler's testimony and "to contest the identification." We do not perceive, nor does defendant suggest, what evidence might have been adduced at a hearing on a motion to suppress which was not presented at trial, nor does defendant argue, except in abstract terms, the grounds on which he contends the identification should have been suppressed.

Further evidence of defense counsel's incompetence, argues defendant, is that he tendered, and the circuit court gave, two instructions, one concerning the alibi defense and another to the effect that defendant's testimony should not be disregarded because he was the defendant. In the context of the instructions in their entirety, assuming *arguendo* that the giving of these instructions was error, the error was harmless. Neither the failure to file a motion to suppress nor the tender of the instructions supports defendant's contention that he was denied the effective assistance of counsel. From our review of the entire record we conclude that defendant was competently and effectively represented. We find no error which would justify reversal and remandment for a new trial.

We consider now the contentions concerning the petition filed under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1975, ch. 38, par. 122—1 *et seq.*). Several of them are identical to the claims of trial error already discussed and need not be further considered. In defendant's petition it is alleged in general terms that the police officers at the Englewood district station fabricated the charge of murder against him in retaliation for his having testified against a police officer who was charged with

murder. Defendant alleged in the petition that Chicago police officers:

"*** went to Ranson Brown, and with force, violence, threats and while handcuffed, brought Ranson Brown to the trial, and en route to said trial said officers told Ranson Brown what he must testify to on the trial.

32. Said officers knew that what they told Ranson Brown to which he must testify was not true but was false, but said officers coerced Ranson Brown into so testifying falsely.

33. Ranson Brown's false testimony on Defendant-Petitioner's trial was that at or about 6:00 or 6:30 P.M. on December 23, 1969, he observed the Defendant-Petitioner in the company of four or five other fellows on Ashland Avenue, southbound towards 67th Street, and that a short time later he observed them running northbound from 67th Street."

Attached to the petition is the statement of Ranson Brown, taken by defendant's appellate counsel approximately 2½ years after the trial. The statement supports neither the conclusional allegation that the People adduced testimony known to the police to be false (see *People v. Martin,* 46 Ill. 2d 565, 56 Ill. 2d 322) nor the assertion that his testimony was in fact false. At most it would seek to modify some portions of his testimony. The petition and statement, considered together, fail to assert the substantial denial of constitutional rights required for post-conviction relief.

In the post-conviction petition defendant also alleged that because he was denied a preliminary hearing he was deprived of a substantial constitutional right. The matters complained of occurred prior to the effective date of the Constitution of 1970 and there was then no constitutional right to a preliminary hearing. *People v. Hood,* 59 Ill. 2d 315.

For the reasons stated the judgments are affirmed.

*Judgments affirmed.*