THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ILIO SILVESTRI, Defendant-Appellant.

First District (3rd Division)   No. 85—3250

Opinion filed October 15, 1986.

Patrick A. Tuite and Brent D. Stratton, both of Law Offices of Patrick A. Tuite, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Sharon L. Gaull, and Robert M. Podlasek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial in July 1985, defendant Ilio Silvestri was convicted of the 1976 murder of his wife, Delores, after the court found defendant had hired another man, Michael Balls, to perform the killing. The trial court sentenced defendant to a term of 35 years. (Eight years earlier, Balls was found guilty of the murder and sentenced to 150 to 300 years. That conviction was affirmed by this court. (*People v. Balls* (1981), 95 Ill. App. 3d 70, 419 N.E.2d 571).) On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt, and that the trial court committed reversible error in admitting hearsay statements of the victim, certain prior consistent statements, and extrinsic evidence of other misconduct by defendant.

Michael Balls testified for the State that he was hired by defendant to protect defendant's tavern from hoodlums. Balls also stated that defendant told him about his family and his expenses and gave various excuses for not paying Balls. Defendant told Balls he was hav-

ing trouble with his wife because he had two children by another woman. Defendant asked Balls to kill defendant's wife, for which defendant would pay $1,500, and Balls agreed. In September, October and November 1976, Balls and defendant discussed details of the plan. Defendant gave Balls a photograph of the victim, and prior to the murder defendant pointed out his wife to Balls in the cafeteria of the Pittsfield Building in Chicago. Defendant suggested that Balls use a knife as a weapon. Balls testified that two weeks prior to the murder he drove his girlfriend, Artie Ross, to the Pittsfield Building and told her about the planned killing and where he would park his car on the day of the murder.

On November 30, 1976, at 7 a.m., Balls left his home, leaving the victim's photograph on his refrigerator. According to plan, Balls met defendant in a restaurant and they went to the 14th floor of the Pittsfield Building together. Defendant had asked his wife to go down from the 14th-floor doctor's office to join defendant in viewing some paintings on the 13th floor. Defendant pointed out the stairwell where Balls was to wait for the victim. At about 10:15 a.m., when the victim entered the stairwell, Balls stabbed her to death. He then ran down to the third floor, where he was later arrested. Balls testified further that he gave statements to the police on the same day. On cross-examination, Balls testified that he was not testifying pursuant to any promises made by the State. On redirect, Balls stated that he had told the police the same facts that he had testified to on direct examination.

Dolores Heilmann, the receptionist in the 14th-floor doctor's office, testified that at 10:15 a.m. the victim told Heilmann she was "supposed to meet [her] husband on the 13th floor at 10:00 o'clock" to see some paintings. At that point the trial court overruled defendant's hearsay objection. Heilmann testified further that the victim left the office at 10:30 a.m., and that defendant came to the office at 11 a.m. looking for his wife. Heilmann also stated that she made statements to police officers before trial.

Artie Ross and her mother, Virgie Ross, both testified that Artie's brother James had told them about defendant's attempts to hire James to kill defendant's wife. Virgie stated that when she and her husband confronted defendant about the offer, defendant said he was just joking. Virgie also testified that she often saw defendant and Balls together.

Artie testified that she had several conversations with Balls in November 1976 about the details of the planned murder. If Balls did not return by 11 a.m., Artie was to take the extra set of car keys and

the title to the car and go to the parking garage to pick up Balls' car, and then contact defendant. However, when Artie went to the garage that morning to pick up the car, she was arrested.

James Ross testified for the State that defendant asked him to kill someone, but later became angry because Ross was delaying. Defendant then said he would have Balls commit the murder. Ross told his sister and his mother about the offer. James testified further that defendant had committed other criminal offenses, including receiving stolen goods and solicitation to commit criminal damage. Defendant hired Ross to damage a nearby store front. Ross also stated that he and others had stolen liquor from defendant and later sold the liquor back to defendant. Ross was imprisoned at the time he testified, and had a mandatory release date.

Officer John Glynn testified that he was one of the officers who informed defendant of his wife's death. Defendant told Glynn that he was to meet his wife at the beauty parlor at 10:30 a.m., but did not mention having previously gone upstairs to the doctor's office to look for his wife. Defendant told Glynn that he did not know a man named Michael Balls. Defendant identified a photograph of Balls as the man who had been threatening him, but said that he knew him as Michael Underwood. Glynn also testified regarding James Ross' statements made in 1976. It was stipulated that prior to the murder defendant had opened a savings account in the name of Michael U. Balls and another man.

Nick Abetecola, the owner of the third-floor Pittsfield Building beauty shop, testified that on November 30, 1976, he left his shop at 10:35 a.m. to get coffee, and returned at 10:45 a.m. A commotion in the building had delayed his return. Five to ten minutes later, defendant came in, found that his wife was not there, and said he would wait for her. Ten minutes later, the police arrived and informed defendant of his wife's death.

Defendant testified that he was forced to pay Balls $50 each week for several months in 1976 for extortion to prevent having his tavern robbed. Defendant also made car payments for Balls. In November 1976, Balls demanded $1,500 from defendant, who refused to pay. Balls repeatedly threatened to harm defendant or his family, despite defendant's arguments that he had many family expenses. In an attempt to convince Balls that he could not pay, defendant gave Balls many details about his family life. On November 29, defendant told Balls that his wife was entering the hospital the next day, and that defendant would be going downtown with his wife in the morning. Defendant also testified that he had family pictures and doctor's ap-

pointment cards behind the bar in his tavern. Balls was often behind the bar, taking liquor and cigarettes, and using the telephone.

On November 30, 1976, defendant drove downtown to meet his wife, who left earlier for a 9:30 a.m. doctor's appointment and a 10:30 a.m. beauty parlor appointment in the Pittsfield Building. They had agreed to meet at the beauty shop and have lunch. Defendant parked the car and went into a restaurant for coffee. When he noticed Balls there, defendant left the restaurant. Balls followed him, demanding the $1,500, and threatening defendant. Defendant left and walked to the Pittsfield Building, where he saw a commotion in the lobby. He went to the third-floor beauty shop but did not see his wife. He then went to the doctor's office where Heilmann told him that his wife had gone. He returned to the third floor and waited. Soon thereafter the police arrived.

Johnnie Anderson testified in rebuttal for the State that Balls told him defendant had asked Balls to kill his wife, and that Anderson had so stated to the police.

■■ We initially consider defendant's argument that the trial court erred in admitting Heilmann's hearsay statement that the victim told her she was supposed to meet defendant on the 13th floor to look at some paintings together. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it falls within an exception to the hearsay rule. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) The State urges that Heilmann's statement is admissible as an exception, and is relevant because it demonstrates the victim's state of mind. Statements indicating a declarant's state of mind are admissible as exceptions to the hearsay rule if the declarant is unavailable and there exists a reasonable probability that the testimony is truthful. (*People v. Floyd* (1984), 103 Ill. 2d 541, 470 N.E.2d 293; *People v. Bryant* (1984), 123 Ill. App. 3d 266, 462 N.E.2d 780.) Such statements, however, must be relevant to a material issue in the case. (*People v. Floyd* (1980), 103 Ill. 2d 541, 470 N.E.2d 293; *People v. Bryant* (1984), 123 Ill. App. 3d 266, 462 N.E.2d 780.) A decedent's hearsay statement is admissible, for example, to show his intent to accompany defendant someplace or to prove that he did so, but is not admissible to show any intent on the part of defendant to go someplace. *People v. Reddock* (1973), 13 Ill. App. 3d 296, 300 N.E.2d 31.

■■ ■ In the present case, the victim was unavailable to testify. In addition, there is a reasonable probability that the testimony was truthful. Heilmann, a receptionist in the doctor's office with no other connection to the victim or defendant, had no reason to lie when she

testified that the victim said she intended to meet defendant at 10 a.m. on the 13th floor to look at paintings. Furthermore, the statement was relevant to the material issue of establishing the chain of events that occurred on November 30, 1976. It is permissible to use state-of-mind evidence to explain an unusual situation, thus explaining the declarant's subsequent conduct after defendant has attacked the story. (See, *e.g., People v. Bryant* (1984), 123 Ill. App. 3d 266, 462 N.E.2d 780.) Here, the State presented the testimony of Balls to show that the victim was supposed to go to the doctor's office and then meet defendant on the 13th floor to view paintings. Defendant attacked this testimony, insisting that his wife was to visit the doctor and then go to the third-floor beauty parlor where they would meet for lunch. Heilmann's testimony explained the victim's conduct in going down the stairs to the 13th floor by showing that the victim intended to meet defendant there. Thus, the statement is relevant to a material issue in the case. (See *People v. Reddock* (1973), 13 Ill. App. 3d 296, 300 N.E.2d 31 (where deceased's statement to his sister was admissible to show his intent to accompany defendant on a trip and that he left on the trip).) Defendant maintains that he does not dispute the fact that decedent went downstairs, since she was found dead on the stairs. The statement is admissible, however, to show the victim's intention to meet defendant on the 13th floor, not merely to show her intention to go downstairs. It is not admissible, nor was it used, to show any intent on the part of defendant to meet his wife on the 13th floor. The trial court properly admitted Heilmann's testimony regarding the victim's statements prior to her death.

Defendant also contends that the trial court improperly admitted evidence of prior consistent statements made by Balls, Glynn, Anderson, Heilmann, and the Rosses. Initially, we note that defendant failed to raise the issue in his post-trial motion, and thus effectively waived the issue for appellate review. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248.) Nevertheless, we will address the merits of this issue. See *People v. Reed* (1984), 125 Ill. App. 3d 319, 465 N.E.2d 1040.

■ Generally, prior consistent statements are inadmissible for the purpose of corroboration on direct examination. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) In addition, prior consistent statements may not be used to rehabilitate an impeached witness by explaining a prior inconsistent statement. (*People v. DePoy* (1968), 40 Ill. 2d 433, 240 N.E.2d 616.) Prior consistent statements, however, may be used to rebut an express or implied charge that the witness is motivated to testify falsely or that his testimony is a recent fabrica-

tion. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Tidwell* (1980), 88 Ill. App. 3d 808, 410 N.E.2d 1163.

■ On cross-examination, Balls was questioned regarding discrepancies between statements made prior to trial and his trial testimony. Additionally, defense counsel raised the issue of what the State had promised Balls to make him testify against defendant. For example, counsel asked if the State promised Balls an early release from prison. Thus, the prior consistent statements were properly raised by the State in rebuttal as a response to the impeachment. The testimony was properly used to rehabilitate Balls after the defense attempted to show that facts he testified to at trial were not included in statements he had previously made to the police. (See *People v. Torres* (1977), 53 Ill. App. 3d 171, 368 N.E.2d 361.) The prior consistent statements were properly used to rebut defendant's charges that the witness was motivated to testify falsely or that his testimony was of recent fabrication.

Defendant further contends that six other State witnesses testified to prior consistent statements. Heilmann was asked whether she gave prior statements, but she never testified as to what was said in those statements. Heilmann did not testify regarding the content of her prior statements and, thus, did not establish their consistency with her trial testimony.

James Ross testified that he told his sister and mother about defendant's request that Ross murder defendant's wife. Ross testified that he told his mother: "I told her, I said, ma, would you believe that Al wanted me to kill someone for him, and it was kind of hard for her to believe at first, but after I told her about all the details, she believed me." It is impossible to determine from this one sentence of testimony whether Ross' prior statement to his mother is consistent with his trial testimony regarding his conversation with defendant. The one sentence of testimony quoted here states that Ross told his mother the details, but it does not recite any details which he claims to have told her. We do not believe that the testimony amounted to an inadmissible prior consistent statement. As to the testimony of Virgie Ross, she merely testified that her son told her of defendant's offer. If the testimony was improper, it was harmless.

■ Artie Ross testified that she became involved in the plan to murder defendant's wife when her boyfriend, Balls, asked her to help. Balls showed her the restaurant where he was to meet defendant on the morning of the murder, showed her the parking lot where he was to park his car before he went to the Pittsfield Building, and asked her to get the car from that lot if he did not return home by 11 a.m.

because that meant that something had gone wrong. Artie also testified that Balls had told her he was supposed to kill the victim on the stairwell leading to the 13th floor, and that defendant would tell his wife to go to that floor so he could buy her a painting. This detailed testimony shows that Balls did in fact make a prior statement that was consistent with his trial testimony. A third person may testify to a prior consistent statement that the third person has personal knowledge of if the statement is admissible. (*People v. Wurster* (1980), 83 Ill. App. 3d 399, 403 N.E.2d 1306.) This testimony does not fall into any of the hearsay exceptions recited above. The State contends that it was used only to show how Artie was involved, and not to bolster Balls' testimony. If this were true, the details of Artie's testimony would have been unnecessary. We believe that the testimony was hearsay and that the trial court erred in admitting it. We find its admission, however, to be harmless error because, although it tended to corroborate Balls' testimony, his testimony was substantially corroborated by other properly admitted evidence, as we shall discuss below. See *People v. Olmos* (1978), 67 Ill. App. 3d 281, 384 N.E.2d 853.

Officer Glynn testified that James Ross had told the police about his conversations with defendant and when Ross refused to commit the murder, defendant "stated, well, that's all right, I'll get Michael to do it." Glynn also recited the details of Ross' statement. As with Artie Ross' testimony, although this hearsay evidence constituted a prior consistent statement, its admission was harmless error because it was cumulative.

■ Defendant contends further that Johnnie Anderson's testimony was an improperly admitted prior consistent statement. Anderson was a rebuttal witness for the State who agreed that he had previously told the police that Balls had said defendant wanted him to commit the murder. This testimony was used to rebut defendant's charge that Balls recently fabricated his story, and thus the evidence falls under the hearsay exception and was properly admitted. See *People v. Torres* (1977), 53 Ill. App. 3d 171, 368 N.E.2d 361.

■ Defendant also maintains that the trial court erred in admitting James Ross' testimony regarding defendant's prior misconduct. Ross testified that defendant fenced goods that Ross had stolen, and that defendant paid him to vandalize a liquor store. Defendant failed to object to this testimony either during trial or in his post-trial motion and thus waived the issue for appellate review. See *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248.

■ We finally address defendant's contention that he was not proved guilty of murder beyond a reasonable doubt. Balls provided de-

tailed testimony of the events leading up to the murder and of the murder itself. These details included the trouble defendant was having with his wife, defendant's offer to pay $1,500 for the murder, defendant's providing Balls with a photograph of the victim, plans to lure the victim to the 13th-floor stairwell, and defendant's opening a bank account for Balls and depositing money in the account. Balls' testimony received strong corroboration from other evidence. It was stipulated that defendant had opened a savings account for Balls. Artie Ross testified that Balls had a photograph of the victim. The police officer testified that defendant said that he did not know Balls. Heilmann testified that the victim planned to meet defendant on the 13th floor to look at a painting. Defendant was proved guilty of murder beyond a reasonable doubt.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGILLICUDDY and WHITE, JJ., concur.