THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE NYBERG, Defendant-Appellant.

First District (1st Division)    No. 1—94—0386

Opinion filed September 18, 1995.

WOLFSON, J., specially concurring.

Jenner & Block, of Chicago (Gregory S. Gallopoulos, Robert L. Denby, and Barbara A. Izzo, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Lawrence Nyberg, was convicted of first degree murder and concealment of a homicide, and sentenced to a 70-year extended term of imprisonment for the murder and five years' imprisonment for the concealment, the sentences to run consecutively. On appeal, defendant contends that: (1) he was not proved guilty of murder beyond a reasonable doubt; (2) the trial court erred in precluding admission of portions of his tape-recorded statement at trial; (3) the trial court improperly failed to limit the cross-examination of his character witness; (4) the trial court improperly allowed the jury to view certain photographs of the crime scene; and (5) his sentence is excessive. For the following reasons, we affirm.

The record reveals the following relevant facts. On May 14, 1991, police discovered the badly decomposed body of Christian Schlotterbeck (Chris), in his apartment located at 1117 North Dearborn, Chicago. On February 11, 1992, agents of the Federal Bureau of Investigation (FBI) arrested defendant in New York City. Defendant's trial commenced in November 1993.

Prior to trial, the State moved *in limine* to bar admission on hearsay grounds of the contents of a tape-recording made by the defendant. The trial court granted the State's motion but allowed counsel to make reference to the fact that a tape was made. The trial court initially reserved its ruling as to whether the tape was hearsay, and after an offer of proof by defendant during trial, ruled the contents of the tape to be both hearsay and self-serving.

At trial, Chris' brother, Donald Schlotterbeck, testified on behalf of the State that he met defendant about 13 years prior to trial. Donald lived in the same apartment building as Chris.

In 1991, Chris developed some swelling in his feet and legs and had difficulty walking. Chris also had high blood pressure and tended to stay in his apartment.

On Sunday, May 5, 1991, Donald and his family entertained Chris and defendant for breakfast at Donald's apartment. Chris avoided talking to the defendant.

On May 7, 1991, Donald received a telephone call from defendant. Defendant stated that he was calling from the airport and that he and Chris were going "to the coast," that Chris was paying for the trip, and that they would be back in one week. Defendant stated that they had to catch a plane in five minutes and that Chris did not have time to talk to Donald.

On Thursday, May 16, 1991, Donald received a letter from defen-

dant, dated May 8, 1991, lacking any return address, and postmarked from Washington, D.C. Donald read the letter into the record. Therein, defendant admitted that he had the only other keys to Chris' apartment and admitted that he moved Chris' body into the bathroom and taped the door shut. Defendant stated: "I would not hurt your brother." Defendant further stated, "In my life I have never had a gun. I hate guns and all types of violence. I would never hurt anyone let alone—hurt anyone let alone your brother"; and "I never in my life have ever touched a gun much less shot anyone." Defendant wrote that his plan was to return to Chicago to turn himself in to the police.

Cook County Medical Examiner Nancy Jones testified that she performed an autopsy on Chris on May 15, 1991. Chris' body was in an advanced stage of decomposition, showing the presence of numerous maggots over the surface of the body and also within the body's orifices. An external examination revealed the presence of several blunt trauma injuries predominantly on the left side of Chris' head. Jones opined that Chris was struck by a hammer at least 15 times.

Next, Chicago police detective Lawrence Aikin testified that on May 14, 1991, he and Detective Kenneth Webb investigated Chris' apartment. The detectives were initially unable to enter the apartment because a key was broken off in the lock, and they gained entry only after the building janitor removed the lock.

Upon entry, Detective Aikin saw furniture in disarray, and various items strewn about the floor, including a bottle of cleaning fluid. A large bloodstain appeared in the middle of the floor, along with a pair of pants and a pair of shoes with socks stuck in them. The adjacent couch had no seat cushions, and blood was splattered on the wall. Dark brown drag marks appeared on the carpeting leading to the kitchen.

The temperature in the apartment was extremely warm and humid; over 80 degrees. An extremely strong odor of decomposing flesh wafted from near the kitchen area. Upon entering the kitchen, the detectives found the couch cushions; the seat cushion covers had been removed. The detectives also saw a small garbage can containing bloody rags and bottles. The detectives noticed a 1991 calendar on the wall of the kitchen, showing the month of May. The calendar showed dates crossed off through May 6, 1991. A Chicago Tribune dated May 7, 1991, lay on the kitchen table.

The adjacent bathroom door was closed, a chair was propped up against it, and all four sides of the doorway had been sealed with duct tape. Clothed in a surgical gown with a gas mask, gloves and boots, Officer Pribek of the mobile crime lab photographed the apart-

ment and searched the premises for evidence. Officer Pribek removed the duct tape surrounding the bathroom doorway, and the police entered the bathroom. Police observed Chris' body on the floor, stretched out in a partial sitting position, his head wedged between the edge of the door frame and the bathtub. Chris' face was black and blue in color, and there were large wounds to his head. His body was bloated and discolored about the stomach, limbs and extremities, and was completely covered with maggots. Chris was clothed in a shirt and a pair of boxer shorts. His shirt was pulled up, partially covering the lower part of his face and shoulders, but because of the seepage of bodily fluids, police were unable to determine the color of the shirt.

Police personnel attempted to remove the body, but were unable to do so because the bodily fluids had caused it to adhere to the floor. Chicago fire department personnel used shovels to pry the remains off of the floor.

After police removed the body, Donald Schlotterbeck attempted to locate Chris' State identification card and ATM card, to no avail. Police, however, ascertained Chris' checking account number and money market fund number.

On May 16, 1991, the police received records from the First National Bank of Chicago (Bank) showing ATM cash withdrawals from Chris' account and transfers of money from Chris' money market account to Chris' checking account. Police met with the Bank operations manager and viewed a videotape of a person making withdrawals from an ATM machine on May 7, 1991, and May 8, 1991.

On that same day, police obtained photographs of the defendant from Donald. Police compared copies of thermoprints, still photographs from the videotape, to the photographs obtained from Donald. Donald examined the thermoprints and identified defendant as the person making withdrawals from the ATM machine. Police also obtained an audio cassette recording from the Bank, and Donald confirmed that the recorded voice was that of defendant.

In July 1991, Detective Aikin received a facsimile transmission (fax) from attorney John Marshall in Plainview, New York, followed by an original letter. The envelope containing the letter also contained the cover sheet from the fax and the envelope in which the original letter was mailed to Marshall. The envelope was postmarked July 15, 1991, Oakland, California. The letter was addressed to Marshall, dated July 13, 1991, and signed "Larry."

On July 28, 1991, police received another letter regarding their investigation. The letter was postmarked July 16, 1991, San

Francisco, California. Police also received a postcard postmarked August 21, 1991, San Francisco, California.

On February 20, 1992, FBI Agent Ron Brannom contacted Detective Aikin, and the Chicago police began extradition proceedings to return defendant to Illinois. On March 31, 1992, Detective Aikin took defendant into custody in New York and returned him to Chicago.

FBI Agent Brenda Heck testified that on February 20, 1992, she arrested the defendant at his place of employment, a restaurant in Manhattan.

At the FBI office, defendant agreed to make a statement. Defendant initially stated that he did not know Chris, then admitted that they were friends for many years in New York and Chicago. Defendant then stated that he found Chris dead in his apartment, and he described in great detail how he concealed Chris' body in the bathroom. Defendant further explained that he withdrew money from Chris' bank account and left Chicago, travelling to many States, and eventually settling in New York. Defendant denied having any involvement in Chris' death. Defendant told Heck about a tape-recording he made two days after finding Chris and stated that he sent the tape to attorney John Marshall. Defendant stated that he thought Chris shot himself.

Heck typed defendant's statement and reviewed it with defendant. Defendant refused to sign the typed statement, based on the advice of an attorney. During the time Heck spent with defendant, he appeared calm, quiet, and unemotional. Defendant did not cry or become upset in Heck's presence.

Following Heck's testimony, the trial court admitted all of the State's exhibits into evidence, reserving its decision regarding whether certain photographs would be published later to the jury.

Defendant then testified on his own behalf that he is 47 years old. In 1976, he met Chris when they were both employed at a catering company in Brooklyn, New York. The two men began socializing in their spare time. Defendant and Chris had keys to each other's apartments. Defendant described his relationship with Chris as "family to each other" and stated that they "were like brothers."

In 1987, Chris seriously injured his shoulder in a slip-and-fall accident. In July 1987, Chris returned to work and reinjured his shoulder when he slipped on a wet floor. Chris lost mobility in his left arm and did not work again. For the next three years, defendant housed and supported Chris in his studio apartment, lending Chris money as needed. In September 1990, Chris owed defendant approximately $5,200.

Defendant referred Chris to attorney John Marshall, to pursue a

personal injury action. The case eventually settled for approximately $72,000. Chris repaid defendant $5,200 out of his settlement money. Chris also gave defendant an additional $7,000.

In September 1990, defendant and Chris moved to Chicago. Defendant obtained an apartment at 14 West Elm, and Chris obtained a furnished studio apartment at 1117 North Dearborn. Chris leased both apartments in his name.

During the time they lived in Chicago, defendant saw Chris daily for breakfast. Defendant and Chris also had dinner together four or five times a week and attended social functions with Chris' family. Defendant and Chris had keys to each other's apartments.

Chris' brother, Donald, moved to Chicago in February 1991. Donald had keys to Chris' apartment for a month and a half.

On Sunday, May 5, 1991, defendant had breakfast with Chris, at Donald's apartment. At that time, Chris was suffering from severely swollen legs and had difficulty breathing. Defendant denied that he and Chris were not speaking to each other.

Since his accident in 1987, Chris' mobility had decreased. In February or March 1991, defendant accompanied Chris to a health clinic and a doctor told Chris that if he did not take "real good" care of himself, he might only have five or six good years left. After this clinic visit, Chris' demeanor changed.

On May 7, 1991, Chris was to be at defendant's apartment for dinner at 7 p.m. At 7 p.m., when Chris failed to show up, defendant telephoned Chris several times and got no answer. Defendant decided to stop by Chris' apartment.

Lobby attendants let defendant into Chris' apartment building. Defendant went to Chris' apartment and knocked on the door. When there was no response, defendant opened the door with his key, turned on the lights, and saw Chris lying on the floor near the sofa. Chris' head and shoulders were covered with blood, and he was not moving.

Defendant approached Chris and called out his name. Then defendant felt Chris' neck and wrists for a pulse, but found none. Defendant noticed blood on the edge of the sofa and a mound of blood on the carpet by Chris' head. Defendant saw another big bloodstain in another area of the living room and blood splatters on the walls. Defendant stated that he thought Chris had shot himself because of his depression.

Defendant thought to get Donald, but he did not do so. Defendant stated that he did not want Donald to see all the blood, so he got some kitchen towels and a bottle of Mr. Clean and started to clean up the blood.

Defendant was extremely upset, and he was crying. He stated: "[M]y world had just caved in around me." Defendant stopped cleaning because he did not see a gun and therefore no longer believed that Chris had killed himself.

Defendant decided that he had to get out of the apartment. He did not call 911 because he had had two prior brushes with the law. Defendant admitted that he was arrested for theft in 1967 and again in 1977 or 1978. After several years, defendant changed his name from Lewis Steven Greenberg to Lawrence Nyberg. After the second arrest, defendant posted bond but never appeared in court. Defendant stated that he was afraid that he would be blamed for Chris' death because he had the only other set of keys to Chris' apartment at the time.

Defendant dragged Chris into the bathroom to delay the authorities from finding him for a few days and to give himself time to leave Chicago. Defendant pushed Chris into an upright sitting position, left the bathroom and shut the door. Defendant then went out and bought a roll of duct tape, returned to the apartment, taped around the door frame, and put a chair against the bathroom door so the wind would not blow it open. Defendant then left the apartment, breaking off his key in the lock on his way out.

Defendant needed additional money to leave Chicago, so he used Chris' ATM card to get money. Chris had given defendant his ATM card approximately six weeks prior to his death. Defendant had Chris' PIN in a security envelope Chris gave him in September 1990.

The next day, at approximately 9:30 a.m., defendant called Donald from a pay phone to ask Donald to care for defendant's cats. Defendant admitted that he lied to Donald, telling him that he and Chris were going to the West Coast, while defendant knew that Chris was dead.

Defendant stated that he used Chris' ATM card to get cash four or five times, four days in a row. Defendant admitted that he transferred $5,000 from Chris' money market account to Chris' checking account. Defendant withdrew approximately $1,200 of Chris' money using Chris' ATM card.

Defendant left Chicago on Thursday, May 9, taking a train to Washington, D.C. Defendant sent a letter to Donald on May 10. On May 11, defendant sent a tape recording to Marshall, along with a letter. Defendant asked Marshall to notify the authorities about Chris.

On July 13, 1991, defendant again wrote to Marshall as follows:
"John
    Just a quick note to apologize for getting you involved in my problems.

I've spoken to a lawyer out here. I told him the whole thing from A to Z. He advised me to say nothing to any one except my own lawyer. (A P.D. I guess) He told me that the case they will try to build, will be circumstantial so anything that I say at this point, [*sic*] will only help them.

Everything I told you on the tape was the truth. I am not a violent person. I have not been in any kind of a fight since I was a teen. Harming people is not in my nature. I could not shoot anyone or anything (I've never gone hunting, ever)

Again I just wanted to say how sorry I am for involving you. Larry"

On the day of his arrest, defendant first learned that Chris died of blunt trauma. Defendant stated that he did not kill Chris.

On cross-examination, defendant admitted that he intended to and did conceal Chris' body. Defendant admitted that he knew that the body would rot.

Defendant admitted that he spent almost all of the $12,000 Chris had given him. Defendant used Chris' ATM card for the first time after Chris died. Defendant admitted that his name was not listed on any of Chris' accounts.

Defendant stated that he owned some tools, including two hammers, which he left in his apartment when he fled Chicago. Defendant admitted that prior to leaving he was in arrears on his rent and had received an eviction notice.

Defendant stated that it took him approximately 10 minutes to move Chris' body into the bathroom and five minutes to seal the door. Defendant pulled Chris by his legs, and in the process, his pants came off. Defendant estimated that he left Chris' apartment at approximately 8 p.m.

Linda Sue Gurski then testified as a character witness on defendant's behalf. Gurski stated that defendant has a reputation in the community as being a very friendly, quiet gentleman.

On cross-examination, and over defense counsel's objection, the State asked Gurski if her opinion would be the same if she knew that defendant concealed Chris' body. Gurski responded that her opinion would not change because she does not believe that defendant committed the murder.

The defense rested its case, and Detective Aikin testified on rebuttal that he searched defendant's apartment on May 22, 1991, and did not find any hammer.

Following closing arguments, the jury found defendant guilty of murder and concealment of a homicide. After a hearing, the trial court sentenced defendant to an extended term of 70 years' imprison-

ment for murder and a consecutive 5 years' imprisonment for concealment of the homicide. Defendant's timely appeal followed.

Initially, defendant contends that circumstantial evidence presented by the State failed to establish his guilt beyond a reasonable doubt.

The determination of the credibility of witnesses and the weight to be given to their testimony is the function of the trier of fact. The trier of fact is not obligated to accept all or any part of the defendant's testimony, but may assess the probabilities, the reasonableness of any defense offered and reject any or all of defendant's account in favor of the State's circumstantial evidence of guilt. (*People v. Boone* (1987), 152 Ill. App. 3d 831, 835, 504 N.E.2d 1271, 1274.) A conviction based upon circumstantial evidence must be based on proof of a conclusive nature that tends to lead to a satisfactory conclusion and produces a reasonable and moral certainty that defendant and no one else committed the crime. (*People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, 804.) This court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. *People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.

In the present case, the record shows that the jury found the evidence presented at trial sufficient to find defendant guilty of first degree murder. Through his own testimony, defendant placed himself at the scene of the crime and admitted that he concealed the body. Defendant further admitted that he fled the jurisdiction to avoid the authorities and that he appropriated money from Chris' bank accounts. When a defendant elects to explain the circumstances of a crime, he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies. *People v. Lester* (1986), 145 Ill. App. 3d 720, 738.

█ All of the evidence presented by the State, as well as defendant's own testimony, could lead the jury to conclude that defendant in fact murdered Chris. We find the evidence against defendant overwhelming and sufficient to find him guilty beyond a reasonable doubt.

Next, defendant contends that the trial court improperly granted the State's motion *in limine* to exclude defendant's tape-recorded statement and cover letter from admission at trial. Defendant objects to the exclusion of the following statements made by defendant on the tape recording sent to attorney Marshall:

(1) "And I thought that Chris had shot himself or something, I didn't know, I didn't know if he had a gun or what."

(2) "I looked around and I didn't see a gun."

(3) "I haven't handled or touched or used a gun in twenty some odd years."

(4) "I haven't touch a gun in twenty some odd years."

The trial court prohibited playing the tape recording into evidence at trial, finding the tape recording and accompanying cover letter hearsay and the statements made therein self-serving. The trial court concluded that defendant could testify as to all of the matters contained in the tape-recorded statement, as well as the fact that he sent a tape to attorney Marshall.

Hearsay is an extrajudicial statement offered in court to show the truth of the matters asserted. (*People v. Edwards* (1991), 144 Ill. 2d 108, 161, 579 N.E.2d 336.) The value of hearsay evidence rests "upon the credibility of the out-of-court asserter." (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738.) Our courts have held that self-serving statements or conversations between a defendant and third parties subsequent to the commission of the crime are not competent evidence and therefore inadmissible hearsay. (*People v. Patterson* (1992), 154 Ill. 2d 414, 610 N.E.2d 16; *People v. Jones* (1962), 26 Ill. 2d 300, 305, 186 N.E.2d 314; *People v. Kosearas* (1951), 410 Ill. 456, 102 N.E.2d 534.) The rationale underlying this exclusion is that the credibility of the defendant is suspect and his statements are not reliable in light of the defendant's motive to fabricate testimony favorable to his innocence. See *People v. Vanda* (1982), 111 Ill. App. 3d 551, 558.

Defendant initially argues that the first three of the above statements are not hearsay, because they were offered into evidence not to prove the truth of the matters asserted therein, but rather as "circumstantial evidence that [defendant] believed that the victim had been shot." In the alternative, defendant argues that three of the above statements are admissible under the existing-state-of-mind exception to the rule against hearsay.

Statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify and there is a reasonable probability that the proffered hearsay statements are truthful. (*People v. Floyd* (1984), 103 Ill. 2d 541, 546, 470 N.E.2d 293, 295; *People v. Davis* (1993), 254 Ill. App. 3d 651, 626 N.E.2d 1187.) In order to be admissible, however, the declarant's state of mind must be relevant to a material issue in the case. (*Floyd*, 103 Ill. 2d at 546, 470 N.E.2d at 295.) It is within the trial court's discretion to determine whether evidence is relevant and admissible, and its exercise of that discretion is not to be overturned absent a clear abuse thereof. *People v. Hayes* (1990), 139 Ill. 2d 89, 130, 564 N.E.2d 803, 820.

■ In the present case, the defendant was available to testify and in fact testified on his own behalf to the same matters contained in the tape recording. It is clear that defendant intended to offer the tape-recorded statements to prove the truth of the matters contained therein: that he believed Chris had been shot. The record shows that defendant communicated these same matters to FBI Agent Heck, who testified to defendant's statements at trial. However, even if defendant's statements on the tape recording may have been relevant to show defendant's state of mind, that he believed that Chris was killed with a gun, in light of the fact that the same evidence was presented at trial, we find the exclusion of the tape-recorded statements harmless.

Defendant further argues that the cover letter, included with the tape, was admissible as a "verbal act." The note read as follows:

"John,

I have some very sad news for you. On Tues nite [sic] I found Chris Schlotterbecks [sic] body.

Please listen to the enclosed tape in private—I want you to please give the info. on the tape to the proper auth. [sic] in Chicago

Thanks

Larry Nyberg"

Defendant argues that the note directs action and is neither true nor false. Defendant argues that the note constitutes an "imperative demand," e.g., "Do this," and therefore is nonhearsay. Defendant cites *Lassai v. Holy Cross Hospital* (1991), 224 Ill. App. 3d 330, 586 N.E.2d 568. There, this court found that the statement of an injured pedestrian's son, wherein he told a hospital nurse that the pedestrian had been hit by a motorcycle and was unconscious immediately following the accident, was a verbal act, and not hearsay, because the statement did not go to the truth or falsity of whether the pedestrian was conscious, but went to whether or not the son told the nurse.

Unlike *Lassai*, defendant's note goes directly to the truth or falsity of its contents. In *Edwards*, our supreme court examined the defendant's contention that his statement "oh, no, oh, no, he can't be dead" was not offered for the truth of the matter asserted, but should have been admitted as a "mere reaction." (*Edwards*, 144 Ill. 2d at 161-62.) The court found that Edwards' statement had no evidentiary value as a verbal act, concluding that the significance of the statement lay in its substantive content and not simply in the fact that it was made. See generally 6 J. Wigmore, Evidence § 1766, at 250 (Chadbourn rev. ed. 1976).

■ Similarly, here, the significance of the defendant's note rested in its substantive content and not simply in the fact that it was

made. It is clear that defendant is attempting to prove that he did not kill Chris but, rather, merely found his body. Thus, the note is not admissible as a verbal act.

Defendant further contends that the trial court erred in refusing to publish to the jury portions of a July 13, 1991, letter, which had already been admitted into evidence.

The record indicates that during the State's direct examination of Detective Aikin, the State marked defendant's July 13, 1991, letter to Marshall as People's exhibit number 16, and later the exhibit was received into evidence. During defendant's direct testimony, defense counsel asked defendant to read a portion of the letter to the jury. However, the State objected, arguing that during Detective Aikin's examination, the letter was marked as an exhibit to indicate the postmark, for the purpose of showing the detective's efforts in tracking the defendant during his investigation. The trial court sustained the State's objection, noting that it had not yet ruled as to what exhibits would be published to the jury. Thus, defendant was not allowed to read to the jury the following excerpts from the letter:

"In my life I have never had a gun."

"I hate guns and all types of violence."

"I never in my life have ever touched a gun much less shot anyone."

The trial court did allow defendant to testify that, in the letter, he told Marshall that he wanted to apologize to him for involving him in the matter and stated "I just thought it was ludicrous if anybody would think I could shoot somebody."

Defendant argues that the statements in defendant's letter were improperly kept from the jury on the ground that once an exhibit is admitted into evidence without restriction, it may be considered generally as evidence of facts stated therein. *Village of Park Forest v. Walker* (1976), 64 Ill. 2d 286, 301-02, 356 N.E.2d 42, 50.

■ We find that the content of the letter is cumulative of the evidence admitted at trial. (*People v. Tye* (1990), 141 Ill. 2d 1, 18, 565 N.E.2d 931.) In the present case, defendant testified at length at trial that he did not kill Chris and that he could not harm anybody. Thus, the trial court properly excluded the letter as hearsay and cumulative of trial testimony.

Finally, defendant contends that the trial court's exclusion of evidence permitted the State to advance false closing arguments. Defendant complains that the State falsely told the jury that defendant: (1) fabricated his story in consultation with an attorney; and (2) never showed any emotion over the death of his friend.

■ We note that defendant failed to object to the statements of

the prosecutor during closing argument. We therefore find that defendant has waived this issue for review. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

Next, defendant contends that the State engaged in improper cross-examination of Linda Gurski as to defendant's prior bad acts. Defendant argues that the State improperly asked Gurski whether her opinion of defendant as a peaceful person would change if she knew that the defendant had admitted to the jury that he concealed Chris' body. Gurski responded that her opinion would not change, because she did not believe that the defendant was guilty of the crime charged.

It is generally said that character may be proved only by evidence of defendant's general reputation in the community for characteristics relevant to the crime with which he is charged and that the personal opinion of an individual witness is competent evidence of neither character nor reputation. (*People v. Greeley* (1958), 14 Ill. 2d 428, 432-33, 152 N.E.2d 825; *People v. Willy* (1921), 301 Ill. 307, 133 N.E. 859.) Since a person's reputation is determined largely by what the group as a whole thinks of him, we have consistently held it improper to permit a character witness to be cross-examined as to his own knowledge of the defendant's particular acts of misconduct (*People v. Hermens* (1955), 5 Ill. 2d 277, 125 N.E.2d 500; *People v. Celmars* (1928), 332 Ill. 113, 163 N.E. 421); rather, such interrogation must be confined to disparaging rumors and conversations which the witness has heard in the community and which negative the character sought to be established. *Greeley*, 14 Ill. 2d at 432.

In *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293, this court determined the cross-examination of a character witness regarding the witness' knowledge of the crime charged against the defendant improper. Such an inquiry insinuates that if the witness has no knowledge of the act of violence charged to the defendant, then the reputation evidence is worthless; the effect is similar to asking the witness about prior bad acts. *Graves*, 61 Ill. App. 3d at 745.

■ We therefore determine that the trial court erred in allowing the State to inquire of Ms. Gurski in this improper manner. However, we find this error harmless in light of the overwhelming evidence against defendant.

Next, defendant contends that the trial court erred in permitting the jury to view certain photographs during its deliberations. In particular, defendant objects to the jury having been allowed to view People's exhibits Nos. 5 and 11, photographs depicting Chris' head at the morgue; and People's exhibits Nos. 33 and 34, photographs of Chris' body at the crime scene. Defendant argues that these four

pictures of the victim inflamed the jury and lacked any probative value to outweigh their prejudicial impact.

Whether or not a jury is allowed to see photographs of a decedent is a decision made by a trial judge in the exercise of his sound discretion. (*People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234.) If photographs are relevant to prove facts at issue, they are admissible and can be shown to the jury unless their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed. (See *People v. Foster* (1979), 76 Ill. 2d 365, 377-78, 392 N.E.2d 6; *People v. Lefler* (1967), 38 Ill. 2d 216, 221, 230 N.E.2d 827.) Moreover, when a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact. (*People v. Speck* (1968), 41 Ill. 2d 177, 201, 242 N.E.2d 208.) Photographs of a decedent may be admitted to prove, *inter alia*, the nature and extent of injuries and the force needed to inflict them; the position, condition, and location of the body; the manner and cause of death; and to aid in understanding the testimony of a pathologist or other witness. Such photographs may also aid jurors in understanding this testimony. (See *People v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465 (pathologist used photographs to explain wounds); see also *People v. Myers* (1966), 35 Ill. 2d 311, 331, 220 N.E.2d 297 (not abuse of discretion to admit photographs even though police officer testified to body's appearance when found).

■ In the present case, the trial court found that the four photographs were sufficiently probative to outweigh their prejudicial effect. The crime scene photographs, showing the general condition of the body and its position in relation to the surrounding area where it was found, were relevant in assisting the jurors in deciding whether the physical evidence was consistent with defendant's admitted concealment of a homicide. The photographs of the body taken at the morgue were relevant to show the location of the wounds, and the character, depth, and extent of the decomposition of the body. These photographs might have improved the jurors' comprehension of the medical examiner's testimony, as well as corroborating testimony regarding the concealment. Thus, the trial court did not err in allowing the jury to view the four photographs of the victim's body.

Lastly, defendant contends that the trial court, in sentencing him to an extended term of 70 years' imprisonment, improperly relied upon (1) his conviction for concealment of a homicide and (2) evidence that he and the victim were friends.

The sentencing decision of a trial court is entitled to great deference and weight (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344), and absent an abuse of discretion by the trial court, a sentence

may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) This court will not substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently had it been charged with the task of sentencing (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541), especially where the sentence imposed by the trial court is within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.

An extended sentence is appropriate "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5—5—3.2(b)(2) (West 1992).

■ In the present case, the trial court sentenced defendant to a 70-year extended term of imprisonment, which is well within the statutory guidelines for first degree murder. (See 730 ILCS 5/5—8—2(a)(1) (West 1992) (first degree murder is punishable with an extended term of not less than 60 years' imprisonment and not more than 100 years' imprisonment).) In sentencing defendant to an extended term of imprisonment, the trial court properly considered all of the evidence at trial, along with all factors in mitigation and aggravation. The trial court specifically found

> "that the circumstances of the killing of somebody's best friend in this particular matter the beating does show exceptional brutal and heinous behavior which is indicative to me of wanton cruelty."

The record does not show that the trial court relied on any improper factor in sentencing defendant to an extended term of 70 years' imprisonment.

For the reasons stated above, we therefore affirm the judgment of the trial court.

Affirmed.

BRADEN, J., concurs.

JUSTICE WOLFSON, specially concurring:

I agree that the defendant's conviction should be affirmed. I also agree that the trial judge did not abuse his discretion when he refused to admit the defendant's tape recording and accompanying cover letter. I write this concurring opinion because I believe the court's opinion perpetuates two mistaken notions of evidence law.

First, the tape recording and cover letter are inadmissible because they are hearsay and no exception to the hearsay rule is applicable.

Period. Whether they are "self-serving" is meaningless. A party does not offer evidence on its own behalf unless it is self-serving. The description adds nothing to the analysis a judge must make when deciding admissibility. In fact, it muddies the analytical waters.

The term "self-serving" is, as the court said in *People v. Vanda* (1982), 111 Ill. App. 3d 551, 557-58, 444 N.E.2d 609, "something of a misnomer." Put another way, "it is irrelevant whether the statement was self-serving or disserving at the time of either being made or offered." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.1, at 635 (6th ed. 1994).

Second, the court's opinion states that the state-of-mind exception to the hearsay rule applies only when the declarant is unavailable. I am aware that the requirement of unavailability appears in several Illinois cases (see *People v. Silvestri* (1986), 148 Ill. App. 3d 980, 500 N.E.2d 456), but, as Professor Graham writes:

"The disturbing indication that this hearsay exception requires that the declarant be unavailable [citations] is incorrect, illadvised and accordingly should not be followed." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.4, at 712 (6th ed. 1994).

The better view is reflected in the Federal Rules of Evidence, where the state-of-mind exception to the hearsay rule applies even though the declarant is available as a witness. (See Fed. R. Evid. 803(5).) Admissibility should depend on the reliability of the evidence. The evidence offered by the defendant in this case was not reliable.

Because I believe an available declarant's statement of his then-existing state of mind can be reliable evidence, I disagree with the court's reasoning on this point.