# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Fleming*, 2013 IL App (1st) 120386

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE FLEMING, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-0386 |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for possession of cannabis contained in a FedEx parcel delivered to defendant was upheld over his contentions that the State failed to prove beyond a reasonable doubt that he knew the parcel contained cannabis, since the officer who posed as the deliveryman testified that defendant was standing outside the house where the delivery was made, defendant approached the deliveryman and asked if the parcel was for a certain person, his actions indicated that he was expecting the parcel and knew the addressee, he offered to take the parcel, and other evidence including cannabis and drug paraphernalia discovered in defendant's residence showed he was engaged in the distribution of cannabis. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-14972; the Hon. Thomas Joseph Henelly, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Carson R. Griffis, all of State Appellate Defender's Office, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion. Presiding Justice Lampkin and Justice Hall concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant George Fleming was indicted on three counts of possession of cannabis with intent to deliver. Count I was for the possession of more than 5,000 grams, contained in a FedEx parcel received by defendant; count II was for more than 2,000 grams but not more than 5,000 grams, contained in a different box and located in a basement to which defendant had access; and count III was for more than 30 grams but not more than 500 grams, found in a bedroom at defendant's residence. After a bench trial, defendant was convicted of counts I and III, which were for the cannabis found in the FedEx box and in the bedroom, but he was acquitted of count II, which was for the cannabis found in the basement. The trial court sentenced defendant to serve the minimum sentence for count I, which was six years in the Illinois Department of Corrections. The court also imposed a concurrent two-year sentence for count III.

¶ 2    On this appeal, defendant does not contest his conviction on count III, which was for the cannabis found in the bedroom. He challenges only his conviction on count I, which was for the cannabis contained in a FedEx delivery. With respect to count I, defendant raises only one claim on appeal. He argues that the State failed to prove beyond a reasonable doubt that he knew that the FedEx parcel delivered to him contained cannabis (1) where he never opened the parcel, (2) where his name was not written on the parcel as the recipient, and (3) where, allegedly, no corroborating evidence was found in the basement. For the following reasons, we affirm.

¶ 3                                   BACKGROUND
¶ 4                              I. State's Case in Chief
¶ 5                        A. Officer Terry: the Delivery Person
¶ 6    Defendant's bench trial began on July 26, 2011, and the State's first witness was Officer Sterling Terry, who testified that he had been an officer with the Chicago police department for 25 years. For the last three years, he had been assigned to the package interdiction team, which concerns packages sent by mail carriers. During his three years with the unit, he had

been involved with hundreds of investigations of parcels, including hundreds of times when he had posed as the delivery person. Terry had been with the narcotics division since 1998 and had been involved with thousands of narcotics investigations, including thousands of cannabis investigations. Based on his experience, Terry was familiar with the look, smell and packaging of cannabis.

¶ 7    Terry testified that, on July 26, 2010, he was assigned to the postal team, and he was working with Sergeant Williams, Officer O'Shea, Officer Hildebrant, Officer Show and Officer Lymperis. It came to their attention that a suspicious FedEx parcel had arrived at a FedEx facility. The parcel had a unique tracking number of 798881365396 and, when it was opened, it was found to contain five plastic heat-sealed packages containing suspected cannabis.

¶ 8    Terry testified that a delivery search warrant was obtained for the package and that the package was resealed with a monitoring device inside of it. He testified that, from the device, the officers would know whether the package was moving, was sitting still or was opened. The device was tracked through radios inside the officers' vehicles. To the best of Terry's knowledge, the device was functioning properly when placed inside the FedEx package.

¶ 9    Terry testified that this particular package did not require a signature upon delivery. Terry's role in the investigation was to pose as a FedEx deliveryman, dressed in a FedEx uniform and drive a van with a FedEx placard on the side. The package was addressed to 6201 South Keating Avenue, Chicago, Illinois. The plan was that he was to wait until other members of the team were positioned so that they could conduct surveillance, and then he would drive up and attempt to make the delivery. At 2:35 p.m. on July 26, his team set up surveillance and then he drove up in the van. After he parked at the southwest corner of 62nd Street and Keating Avenue, he exited the vehicle and began to approach the building located at 6201 South Keating Avenue.

¶ 10    Terry testified that, as he approached, he observed a man standing outside the building, whom Terry identified in court as defendant. As Terry approached the residence, defendant approached Terry and asked: "Is that a box for Curry?" Terry replied, "Ashley Curry," and defendant stated: "I'll take that." Terry then handed defendant the box and turned to walk away, and defendant turned to go back toward the residence. As Terry was approaching his vehicle, he turned and observed defendant enter the residence at 6201 South Keating Avenue. Then Terry left the area.

¶ 11    Terry then identified People's Exhibit 1 as a copy of the label that was attached to the box. The label was addressed to: "Ashley Curry, 6201 South Keating, Chicago 60629." The return address was: "208 Crossing Boulevard" in Framingham, Massachusetts. The parcel type was listed as: "Priority overnighter." The label did not state that a signature was required.

¶ 12    Terry then identified People's Exhibit 2, which was the box that Terry delivered. Terry testified that the box was in a different condition than when he delivered it, in that: someone had written "Bathroom" on the side of it; it was broken down; and the mailing label had been removed. Terry was able to identify the box by a yellow sticker with a number that was present on the box when he delivered it.

¶ 13    On cross-examination, Terry testified that the label did not state specifically that no signature was required. When Terry arrived, defendant was already standing on the sidewalk. Terry denied that defendant said that he was not Mr. Curry; that Terry asked defendant to sign for the package; and that defendant refused to sign for it because he was not Mr. Curry. Terry also denied asking defendant to take the box because Mr. Curry lived on the second floor.

¶ 14                    B. Officer Hildebrant: the Primary Surveillance Officer

¶ 15    The State's next witness, Officer Judy Hildebrant, testified that she had been a Chicago police officer for 21 years and that, for the last almost 12 years, she had been a narcotics agent on the package interdiction team. She had been involved in thousands of undercover postal deliveries and recovered cannabis hundreds of times. Based on her experience, she was familiar with the odor and appearance of cannabis. On July 26, 2010, in the early morning hours, she intercepted a package at a FedEx facility, sent by "a third-party shipper" from FedEx's Bedford facility. She explained that a third-party shipper was a shipper that would receive packages on behalf of FedEx, such as a Kinko's. The package was addressed to Ashley Curry at 6201 South Keating Avenue, in Chicago, and the return address was located in Massachusetts.

¶ 16    Hildebrant asked FedEx personnel to run a check on the package's tracking number and they informed her that the parcel was actually sent from California. The transcript in the appellate record states that Hildebrant testified that "California is a sore state for the shipment of narcotics." The transcript states "sore" rather than "source," but we regard this as a minor discrepancy.

¶ 17    Hildebrant also testified that FedEx personnel informed her that the package did not need to be signed for on delivery. She testified that the package bore the same tracking number already testified to by Terry. The package was transported to "Homan Square where a positive canine alert was obtained." Then a search warrant was obtained, and the package was opened to reveal five heat-sealed bundles each containing a substance which field-tested positive for cannabis. Her team then obtained a delivery search warrant and a court order for an electronic monitoring device. At 2:35 p.m., she traveled with her team to the vicinity of 6201 South Keating Avenue, where she acted as a surveillance officer.

¶ 18    Hildebrant testified that she positioned herself so that she could observe the side of the residence, where the main entrance was, and she was approximately 75 to 100 feet from it. She then observed Terry pull up in the van and exit, and retrieve the parcel from the back of the van. Terry started to approach the residence when he was approached by a black man, whom Hildebrant identified in court as defendant. There was a short conversation, and then defendant took the box from Terry and entered the residence.

¶ 19    Hildebrant testified that she was monitoring the signal emitted from the box and that it indicated movement "for a good 10 to 15 minutes." During this time, she did not observe anyone enter or exit the residence. After 15 minutes, the signal "went into a rest mode with a slow, steady beep," which means that "the box is lying flat and still." From that point on, and during the rest of the surveillance, the monitor indicated that the box remained

stationary. At 3:40 p.m., Hildebrant observed defendant exit the residence with a black woman and a black man. The woman and defendant entered "a black Blazer," while the unknown man entered another "SUV." Both vehicles then pulled away from the residence.

¶ 20    Hildebrant testified that, at 5 p.m., defendant and the woman returned to the residence in the black Blazer with four children, and they all entered the residence. At 6:15 p.m., defendant and the woman and the four children left the residence, this time entering a white van, and then they left the area. At 9 p.m., the white van returned, and the four children exited the van and entered the residence. Defendant remained in the van for a while; then he exited and walked up and down the sidewalk while talking on a cellular telephone. He did not reenter the residence. At 9:30 p.m., the four children exited the residence and entered the van with defendant and the woman, and left the area.

¶ 21    Hildebrant testified that, during her surveillance, she was in a position to observe both the main door to the residence and the alley behind the residence and, except for the testimony that she already provided, no other individuals entered or exited the residence.

¶ 22    Hildebrant testified that, at 9:30 p.m., her supervisor decided to execute the search warrant and obtain the parcel. Officers stopped the van and brought defendant back to the residence. Then the team executed the warrant, gaining entry using defendant's keys. At 9:45 p.m., Hildebrant had a conversation with defendant while in the front room of the residence; Sergeant Williams was also present.

¶ 23    Hildebrant testified that she asked defendant for the location of the parcel, and he replied that "he didn't know what box." Hildebrant then explained that she had observed defendant receive a FedEx box. Defendant replied that "he didn't sign for that box, ask the driver, he just took it." Hildebrant then asked: "Okay. Since you just took it, where is the box, where is the parcel at?" Defendant then replied "that it had been picked up and that he accepted boxes for other people all the time."

¶ 24    Hildebrant testified that another officer came and stayed with defendant and Hildebrant went to a bedroom where another officer showed her some cannabis that had been recovered, as well as some packaging material and drug paraphernalia. Hildebrant also recovered a letter on a dresser in the bedroom that was addressed to defendant at 6201 South Keating. Defendant identified the bedroom as his bedroom, as well as his girlfriend's bedroom.

¶ 25    Hildebrant testified that she then searched the kitchen, where she found the FedEx label in the garbage, and it had been torn to pieces. This was the same label that she had observed earlier on the package. Hildebrant was also the evidence officer, so after other officers had recovered evidence, they brought it to her. She transported it in her vehicle to Homan Square, where she turned it over to Officer O'Shea to be inventoried.

¶ 26    Hildebrant testified that, back at Homan Square, she spoke to defendant in an interview room at 10:30 or 11:30 p.m. on July 26, with no one else present. She read defendant his *Miranda* rights and then asked him if he would like to tell her "anything about the box." Defendant replied "what box?" and then he said nothing further.

¶ 27    Hildebrant then identified People's Exhibit 1 as a copy of the label that had been attached to the package, and she read both the addressee and the sender, as well as the tracking number. The sender was listed as Morgan Jurgenson, 208 Crossing Boulevard, Framingham,

Massachusetts. Hildebrant identified People's Exhibit 2 as containing both the box and the pieces of label that she had retrieved from defendant's kitchen garbage can. She testified that the box was in substantially the same condition as when she retrieved it from the FedEx facility, except for the fact that someone had written "Bathroom" on the side with a black marker.

¶ 28 Hildebrant identified People's Exhibit 5 as "the proof of residency." Specifically, it was the envelope that she recovered from the dresser in defendant's bedroom that was addressed to defendant at 6201 South Keating Avenue, Chicago, from the Illinois Department of Human Services. An investigative officer ran a computer check and discovered that there was no Ashley Curry residing at that address.

¶ 29 On cross-examination, Hildebrant admitted that she was not in a position to observe the back doors. She stated that she could observe the alley, that she would have seen someone approaching through the alley, and no one did. However, she admitted that, if someone approached the back doors from another yard, she would not have observed that person. She also admitted that she never went to the second floor of the residence to ascertain whether someone named "Curry" lived there, and she also did not check the mailbox to see if the name "Curry" was there. She also conceded that her police report made no reference to another officer investigating the name "Ashley Curry."

¶ 30 On cross-examination, Hildebrant testified that Officer Terry was carrying a FedEx folder which was a thing "that they carry around for people to sign things on." Officer Terry had previously testified that, although he sometimes carries a FedEx notebook for people to sign when he makes these types of deliveries, he did not carry one on this occasion.

¶ 31 C. Sergeant Williams: the Supervisor

¶ 32 The State's next witness, Sergeant Brad Williams, testified that he had been employed with the Chicago police department for 35 years and that he had been assigned to his current unit for 20 years. During that time, he had conducted "[t]housands upon thousands" of cannabis investigations and, thus, was familiar with the look, packaging and smell of cannabis. He had been personally involved with several hundred undercover deliveries of parcels that contained narcotics or cannabis.

¶ 33 Williams testified that, on July 26, 2010, at 2:35 p.m., he was the supervisor of a team that conducted an undercover delivery of a FedEx parcel at 6201 South Keating Avenue. Officer Terry was the delivery person and Officer Hildebrant was at the primary surveillance post. In addition to supervising, Williams also conducted surveillance and relieved other officers for breaks. Williams explained that, at 9:30 p.m., he made the decision to stop defendant and end the surveillance, because the surveillance had already lasted seven hours and "it was becoming too stressful on the officers." Williams, who was in an unmarked vehicle, drove and stopped, so as to block the path of defendant's van. Williams then exited his vehicle, approached defendant's van and identified himself as a police officer. In addition to defendant, the van's occupants included a woman and several children.

¶ 34 Williams testified that he asked defendant to exit the van and asked for his driver's license. Williams told defendant: "we delivered a package to the house and I wanted our

package back." Defendant answered: "I don't know what you're talking about. I don't know anything about a box." After that conversation, Williams placed defendant in handcuffs, read him his *Miranda* rights, and placed him in Williams' unmarked vehicle. Williams then drove back to the residence.

¶ 35    Williams testified that he could not remember if the key to the residence was found in defendant's pocket or on the key ring for the van. Williams testified: "I had several sets of keys, and it took me a while to figure out which key, but I finally opened the door." After the door was open, the officers entered the apartment and spread out, looking for other persons in the apartment. Williams brought defendant into the apartment and turned him over to Officer Hildebrant, who then asked defendant: "We want the box back. Where is the box?" Defendant denied any knowledge of the box. Then Williams went downstairs with Officer Show to search the basement. To access the basement, he went out the kitchen door and down five or six stairs, which were four or five feet from the door. Williams testified: "I don't believe you could get into that basement without going through the apartment on the first floor."

¶ 36    Williams then described the basement as follows: "There were boxes stacked all around on the walls, bikes, Christmas decorations, the basement was full of articles. It was leaking, moldy, water running on the floor, it was a mess." Officer Show then called his attention to the FedEx box that had been delivered.

¶ 37    Williams testified that he observed the delivered FedEx box, which was located behind some bicycles and Christmas decorations and on top of a pallet. The FedEx box now had the word "Bathroom" written across it. There was another box on top of it that "was full of weed." This second box was slightly opened, and bags of cannabis were visible through the slit. A black bag was on top of the two boxes.

¶ 38    On cross-examination, Williams testified that from the back door, one could access both the kitchen and the basement, but not the second floor.


¶ 39                    D. Officer Show: Search of Basement

¶ 40    The State's next witness, Officer Show, testified that he had been a Chicago police officer for 22 years, and that he had been with the postal interdiction team for 12 years. During that time, he had participated in over a thousand cannabis investigations and over a thousand undercover deliveries. As a result of this experience, he was familiar with the look, packaging and smell of cannabis. On July 26, 2010, at 2:35 p.m., he was part of the team that conducted an undercover delivery to 6201 South Keating Avenue. When the officers later entered the apartment, he ascertained that no one was inside. He then accompanied Sergeant Williams down to the basement, where he spotted the FedEx box that had been delivered.

¶ 41    Officer Show described the location of the FedEx box as Sergeant Williams had, except that Show elaborated that the box on top had previously been inside the black plastic bag, but the bag had ripped and the box had been cut open. Show also testified that he could observe bundles of cannabis through the slit in the top box. Show later discovered that the top box contained 11 bundles of cannabis.

¶ 42    On cross-examination, Show testified that he could not recall how many washing

machines or dryers were in the basement, and that he could not tell if the basement's contents belonged to one family or two.

¶ 43                                  E. Officer O'Shea: Search of Bedroom

¶ 44       The State's next witness, Officer Dennis O'Shea, testified that he had been a Chicago police officer for 30 years and that he had been a member of the postal interdiction team for 16 years. He had personally made approximately 50 undercover deliveries, and that he had been part of a team handling such investigations several hundred times. He had also been a part of a team that recovered cannabis several hundred times. From this experience, he was familiar with the odor and packaging of cannabis. On July 26, 2010, he was part of the team that executed a search warrant at 9:30 p.m. at 6201 South Keating Avenue.

¶ 45       O'Shea testified that defendant provided a key to the apartment and that, after entering, O'Shea went immediately to his right, to a bedroom which defendant identified as his bedroom. As O'Shea entered, he could smell the odor of cannabis. O'Shea then recovered three plastic bags containing cannabis, which were in plain view on the floor of the bedroom. The bedroom contained a small personal safe which contained a small plastic bag which, in turn, contained several hundred "small plastic Ziploc baggies." O'Shea testified that, based on his past experience, this type of bag was used to package drugs. O'Shea recovered from the dresser a second plastic bag which also contained numerous small plastic baggies that were similar to the ones found in the safe. The baggies were all different colors and with different designs on them. Several of the baggies had a symbol of an apple with a series of numbers after a "TM" or trademark sign, as well as "a marijuana leaf symbol" on the bag.

¶ 46                                  F. Stipulation; Motion for Directed Finding

¶ 47       The State then read into evidence a stipulation between the parties that stipulated to the chain of custody for the cannabis, as well as to the fact that it was cannabis, and the weights of the cannabis recovered. The weight of the cannabis recovered was: (1) from the bedroom, 385.6 grams; (2) from the box in the basement, 2,688.8 grams; and (3) from the FedEx box, 6,330.5 grams.

¶ 48       After the State rested, defendant moved for a directed finding, arguing that there was no showing that defendant was the only person who had access to the basement and that there was no evidence about who lived on the second floor. Defendant argued that "Mr. Curry" lived on the second floor and had access to the basement. Defendant specifically stated that he was not "arguing about what was found in the bedroom." The trial court denied the motion, and the trial was continued until September 29, 2011.

¶ 49                                              II. The Defense Case

¶ 50       The defense called two witnesses: defendant and his fiancée.

¶ 51                                                   A. Defendant

¶ 52       Defendant testified that, on July 26, 2010, he resided at 6201 South Keating Avenue,

-8-

which had two stories and three apartments. There was one apartment on the first floor and two apartments on the second floor: a second-floor front apartment, and a second-floor back apartment. Defendant lived in the first-floor apartment.

¶ 53    Defendant testified that there were three doors from which one could enter his first-floor apartment: from the south side, the east side and the north side. However, there was no door on Keating Avenue. The main entry was on the north side, on 62nd Street.

¶ 54    Defendant testified that there were three doors to the second floor. There was one door on the north side that led to both of the second-floor apartments, and then there were two doors on the south side. Defendant testified that there was also "an enclosed back porch door" that led to the basement.

¶ 55    Defendant explained that the north or 62nd Street side contained two doors: one that led upstairs, and one that led to defendant's apartment. The south side contained his kitchen door, as well as a back door for the people who lived on the second floor.

¶ 56    Defendant testified that, on July 26, 2010, he was outside washing his vehicle on the north or 62nd Street side, when a FedEx deliveryman walked up to defendant and stated that he had a package for "6201." Defendant believed that the name which the deliveryman said sounded something like "Terry" or "Terry Dore," and defendant replied that it was not for him. Nonetheless, the deliveryman asked defendant to sign for the box, and defendant replied that he would not sign for it if it was not for him. The deliveryman "just left [defendant] the box," and defendant stated that he would give it to whoever it belonged to in the building. After the deliveryman left, defendant walked through a gate on the north side of the building and through a gangway, and laid the box on the back porch. Defendant did not have any contact with that box at any time for the rest of the day. Defendant did not take the box downstairs and did not rip the label off of it.

¶ 57    Defendant testified that, later that day, he observed one of his neighbors walking to the mailbox on the south side of the building, and defendant informed him that there was a package on the back porch that might be for an upstairs tenant and that it might be this neighbor's package. The neighbor said okay.

¶ 58    On cross-examination, defendant was asked if anyone by the name of "Anthony Curry" lived at the residence, and defendant replied no. Defendant stated that someone named "Terry" lived upstairs, and "Terry" was the name that he thought the deliveryman had asked about. After the deliveryman left, defendant placed the box down and finished washing his vehicle, and then he walked to the back porch and placed the package there. Defendant clarified that there were two mailboxes, one for upstairs and one for downstairs. The State then showed defendant a photograph of the mailboxes which depicted two names: John McClennan and Jacqueline Door. However, defendant could not say whether these two names were on the mailboxes on July 26, 2010.

¶ 59    On cross-examination, defendant testified that he had not used marijuana in 15 years, and he did not sell it. The neighbor who came by after the delivery was called Junior and defendant encountered him about 45 minutes after the delivery. Defendant thought the delivery occurred at about noon but he was not paying attention to the time. After defendant dropped the parcel on the back porch, he entered his apartment. His fiancée, Barbara Ridley,

and her son were in the apartment, as well as "the kids." Then defendant, Ridley and her son left to return some shoes, and then defendant and Ridley returned to the apartment. Defendant and Ridley left a second time later that day and returned. Then around 8 p.m., he and Ridley left with the five kids, who ranged in age from 5 to 16. However, their vehicle was pulled over, and defendant was handcuffed and was not questioned at that time, but was placed in another vehicle and driven around the corner. The driver then said "give me the keys or I can break it down." The keys were in defendant's vehicle, so the driver went back to defendant's vehicle to retrieve the keys and opened the door. Then defendant was handcuffed to a chair in the front room, and one of the officers asked defendant about a box. At first, defendant said "what box?" and the officer mentioned the FedEx box, and defendant said that he had placed it on the back porch. However, he said that he was not sure; it could be gone, because he had already told a neighbor about the package.

¶ 60　　　On cross, defendant testified that the officers asked him where his bedroom was and he told them that his bedroom was the middle bedroom. However, the officers entered a different bedroom which was a kid's bedroom. Defendant and Ridley shared one bedroom, and there were two other bedrooms. Defendant testified that he did not have access to the basement from the kitchen door, but did from the dining room door. The only items that he stored in the basement were "[m]aybe some tools." Later, after he was transported to the police station, the police did not question him.

¶ 61　　　　　　　　　　　　　B. Barbara Ridley

¶ 62　　　Ridley testified that on July 26, 2010, she lived at 6201 South Keating, which contained three apartments: one on the first floor and two on the second. The back door led to the basement, and the tenants upstairs had access to it. Ridley has five grandchildren who also lived there and who were at the residence the entire day. At 1:30 or 1:45 p.m., she and defendant left to exchange a pair of shoes at a mall, and they returned just before 3 p.m. At some point, she observed defendant carry a FedEx box from the outside to a back area near the basement. At another point, one of the children was picked up by his mother. Sometime in the evening, she and defendant left to visit her father in the hospital; then they returned, retrieved the remaining children and headed out to eat. However, their vehicle was stopped in the middle of the block. She did not realize that the men stopping them were police officers because they did not have badges and they were not in marked vehicles. The men jumped out of their vehicles with guns. Ridley stated that, while she used the basement for storage, defendant stored "[n]o more than weights" down there, when they first moved in. However, he did not go down to the basement to use the weights.

¶ 63　　　　　　　　　　　　III. State's Rebuttal Case

¶ 64　　　The State called two witnesses in rebuttal; it recalled Officer Judy Hildebrant, and also called Investigator James Lewandowski.

¶ 65　　　Officer Hildebrant testified that, at 10 p.m., on July 26, 2010, she had a conversation with Ridley as Ridley sat in her van, and Ridley stated that she had not observed defendant with a package all day. The trial was then continued to October 26, 2011, when Officer

Lewandowski testified. He testified that he interviewed Ridley on April 1, 2011, and asked whether she would testify at defendant's trial. She said that she did not know whether she would testify and she did not know what she could testify to. The investigator did not ask her whether she was present when defendant was arrested. After closing arguments, the trial was continued to November 2, 2011, for the verdict.

¶ 66                                    IV. Conviction and Sentencing

¶ 67    Before issuing its verdict, the trial court made detailed factual findings. First, it stated what was not in dispute: that a package containing cannabis had been sent to defendant's residence from a fictitious Massachusetts return address; that the package was actually from California, which is a source state; that the package was not addressed to defendant but to "Ashley Curry"; and that the package was delivered on July 26, 2010, and received by defendant.

¶ 68    The trial court observed that the court had to decide whether defendant was a knowing or innocent recipient, and that there was a credibility dispute between the testimony of the officers and defendant. The officers testified to having certain conversations with defendant about the FedEx parcel, and defendant denied having these conversations. The trial judge stated: "judging the credibility and the demeanor of the witnesses, I choose to believe the officers." The court then found defendant guilty on count I, which concerned the cannabis in the FedEx parcel. However, the court found that the State failed to carry its burden in proving that defendant possessed the other box in the basement and, thus, it acquitted defendant of count II. As for count III, the trial judge stated that he "believe[d] the officers in the statements the defendant made indicating that was in the bedroom," and the court found defendant guilty of count III, which related to the cannabis found in the bedroom.

¶ 69    On December 5, 2011, the trial court denied defendant's posttrial motion and sentenced defendant to the minimum on count I which was six years, and two years on count III, to run concurrently with count I. On December 19, 2011, the trial court denied defendant's motion to reconsider his sentence; and defendant filed a timely notice of appeal on January 18, 2012, and this appeal followed.

¶ 70                                              ANALYSIS

¶ 71    On this appeal, defendant's sole claim is that the State's evidence was insufficient to support his conviction on count I, which concerned the cannabis contained in the FedEx parcel received by defendant. When a defendant challenges the sufficiency of the evidence, our standard of review is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not the function of this court to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Only where the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 72    In order to sustain defendant's conviction for possession of a controlled substance with intent to deliver, the State must prove that: (1) defendant had knowledge of the presence of the drugs; (2) the drugs were in defendant's immediate possession or control; and (3) defendant intended to deliver the drugs. *People v. Bui*, 381 Ill. App. 3d 397, 419 (2008) (citing *People v. Robinson*, 167 Ill. 2d 397, 407 (1995)).

¶ 73    In the case at bar, defendant claims that the State failed to prove knowledge. Specifically, he claims that the State failed to prove beyond a reasonable doubt that he knew that the FedEx parcel contained cannabis (1) where he never opened the parcel, (2) where his name was not written on the parcel as the recipient, and (3) where, allegedly, no corroborating evidence was found in the basement.

¶ 74    The element of knowledge is rarely shown by direct proof, and is usually established by circumstantial evidence. *Bui*, 381 Ill. App. 3d at 419 (citing *People v. Sanchez*, 375 Ill. App. 3d 299, 301 (2007)); *People v. Hodogbey*, 306 Ill. App. 3d 555, 559 (1999). "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt ***." *Hall*, 194 Ill. 2d at 330. "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *Hall*, 194 Ill. 2d at 330. "It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Hall*, 194 Ill. 2d at 330.

¶ 75    Knowledge may be established by evidence of the acts, statements or conduct of the defendant, as well as the surrounding circumstances, which support an inference that he knew that there were drugs in the place where they were found. *Bui*, 381 Ill. App. 3d at 419 (citing *People v. Nwosu*, 289 Ill. App. 3d 487, 494 (1997), and *Sanchez*, 375 Ill. App. 3d at 301); *Hodogbey*, 306 Ill. App. 3d at 560. In addition, when drugs are found on premises that are under defendant's control, the fact finder is free to infer that defendant knew they were there, so long as there are not other circumstances that create a reasonable doubt as to guilt. *Bui*, 381 Ill. App. 3d at 419 (citing *People v. Denton*, 264 Ill. App. 3d 793, 798 (1994), and *People v. Bell*, 53 Ill. 2d 122, 126 (1972)). The fact finder may infer control over the premises if defendant lived there. *Bui*, 381 Ill. App. 3d at 419 (citing *People v. Lawton*, 253 Ill. App. 3d 144, 147 (1993)).

¶ 76    As the trial court observed, many of the key facts in the case at bar were not in dispute: that a FedEx package containing cannabis was sent to defendant's building from a fictitious Massachusetts address; that the package was actually sent from California, which was a source state for marijuana; and that the package was delivered to and received by defendant. The issue with respect to count I, as the trial court observed, was whether defendant was a knowing or innocent recipient.

¶ 77    The evidence was sufficient to establish beyond a reasonable doubt that defendant was a knowing recipient. First, Officer Terry, the deliveryman, testified that, as he approached the residence, defendant took the affirmative step of approaching him. Before Terry said anything, defendant asked: "Is that a box for Curry?" Defendant's question showed that he knew the name of the addressee on the box and that he was expecting it. When Terry replied "Ashley Curry," defendant said, "I'll take that." Although defendant denied this entire

conversation, the trial judge, who had the opportunity to observe both witnesses, made a credibility determination and stated that he "believe[d] the officers." This conversation provided evidence that defendant was a knowing recipient by showing: (1) defendant's eagerness to receive the box, as indicated by his approaching the deliveryman; (2) his advance knowledge that FedEx was going to be delivering a package addressed to "Curry"; and (3) his familiarity with the false last name on the box, before he even received it. *Cf. Hodogbey*, 306 Ill. App. 3d at 561 (where defendant merely accepted a package specifically addressed to him, that act, without more, was not indicative of guilt).

¶ 78    The evidence found in defendant's bedroom showed that defendant was engaged in the distribution of cannabis and, thus, it corroborated the evidence provided by Officer Terry's testimony that defendant was a knowing recipient of the FedEx package. *Bui*, 381 Ill. App. 3d at 420 (the inference that defendant knew what was in the UPS package that he received was "strongly supported by the presence of other drug paraphernalia in defendant's bedroom, including a digital gram scale, small plastic bags and [drugs]"). Defendant's bedroom contained a safe, three plastic bags containing cannabis and several hundred "small plastic Ziploc baggies," with designs and in different colors. Officer O'Shea testified, based on his extensive prior experience, that these baggies were the type of bag used to package drugs. One bag even had "a marijuana leaf symbol" on it. Officer O'Shea testified that he could smell the odor of cannabis as he entered the room.

¶ 79    The evidence in the bedroom corroborated that defendant was a knowing recipient of the FedEx package, even though defendant denied that this bedroom was his bedroom. Defendant testified that this bedroom was the bedroom of his fiancée's grandkids, thus contradicting the testimony of Officer Hildebrant who had testified that defendant had indicated that this bedroom was defendant's bedroom. However, the trial court, who heard the testimony first-hand, found the officers to be more credible.

¶ 80    Defendant's theory of the case was that the package was intended for someone else who lived in the building. However, even defendant could not say that someone named "Curry" lived in the building. Where the defendant relies upon circumstantial evidence to argue that someone other than defendant committed the crime, a trier of fact may reject the argument if it is "mere surmise or possibility." *Hall*, 194 Ill. 2d at 332. The trier of fact is not required to disregard inferences which flow normally from the evidence or to accept any possible explanation consistent with innocence. *Hall*, 194 Ill. 2d at 332.

¶ 81    Defendant also claims that he placed the package on the back porch and someone else must have moved it to the basement. Even if someone else did move the package from the back porch to the basement and hid it behind bicycles and Christmas decorations, that does not mean that defendant did not also know what was in the box.

¶ 82    Whether defendant knew about the presence of drugs is a question of fact for the fact finder (*Bui*, 381 Ill. App. 3d at 421) and, in this case, the fact finder concluded that defendant did know that the FedEx box contained cannabis. Officer Terry's testimony that defendant knew the addressee's name on the box before receiving it and that he was expecting a delivery under that name, plus the corroborating evidence provided by the drugs and drug paraphernalia found in defendant's bedroom, provided sufficient evidence for a fact finder

to conclude that defendant knew that the FedEx box contained drugs. After having read the entire record and considered all the facts in this case, we can find no reason to overturn the trial court's verdict.

¶ 83                                   CONCLUSION

¶ 84       For the foregoing reasons, we find that there was sufficient evidence to find defendant guilty beyond a reasonable doubt on count I, and we affirm the judgment and sentence of the trial court.

¶ 85       Affirmed.