# Illinois Official Reports

## Appellate Court

---

### *People v. Scott*, 2018 IL App (2d) 151056

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES ADRIAN SCOTT, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-1056 |
| Filed | February 23, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 15-CF-757; the Hon. Ronald J. White, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Jack Hildebrand, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Patrick Delfino, Lawrence M. Bauer, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices Schostok and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Charles Adrian Scott, appeals from his conviction of a single count of possession with intent to deliver at least 100, but less than 400, grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(B) (West 2014)). He contends that the State's evidence was insufficient to sustain the conviction in that it failed to show that he knew that a parcel that he accepted contained cocaine. We hold that the State's evidence was sufficient, especially considering the implausibility of defendant's testimony, which we hold we may consider when we evaluate the sufficiency of the evidence as a whole. We therefore affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant had a jury trial on the one count of which he was later convicted. The State's evidence showed that, on March 31, 2015, Alexander Lupiani, a postal inspector at O'Hare Airport, noticed that a parcel addressed to "Jameka Simms" at 1104 Cedar Street in Rockford, from "Tamika Simms" in Tempe, Arizona, had what he deemed to be "excessive tape," a characteristic that he associated with the mailing of narcotics. He further noted that the return address included a nonexistent house number and that Arizona was "one of several states that is a source for narcotics." Lupiani arranged for a narcotics dog from the customs service to sniff the parcel. The dog alerted to the parcel, so Lupiani obtained a warrant to open it. Inspectors found that it contained a total of about 2300 grams of a "white powdery substance" formed into two bricks. These bricks were under a bag of toys that was contained in a separate box inside the parcel.

¶ 4    The postal inspectors decided to remove all but about 150 grams of the substance and make a "controlled delivery" of the parcel. They replaced the missing powder with baby wipes, fitted the parcel with a GPS unit and a beacon to broadcast an alarm when the parcel was opened, brushed on a fine powder that is visible under ultraviolet light, and resealed the parcel. On April 1, 2015, the postal inspectors, in cooperation with the Rockford police, established surveillance positions around 1104 Cedar Street, which was a two-story, single-family house. William Scott (William), a postal inspector, dressed as a mail carrier to make the delivery and carried a cell phone set up to act as a one-way radio link. The State introduced into evidence a recording of the transmission over that link. William arrived at the door somewhat before noon. Defendant answered the door. William asked defendant if he knew a Tamika Simms. Defendant said that he was unfamiliar with that name. William offered to leave a postal delivery slip for defendant to leave for the parcel's proper recipient. After noting that his girlfriend was at work, defendant agreed to sign for and accept the parcel. On the recording, defendant seems to say that the parcel might have something to do with his "old lady." William told him that, if the parcel "was not for anybody at the address[, he should] just return [it] to the post office." Defendant signed for the delivery as "Charles Scott," using his real name. After making the delivery, William used the cell phone link to give the other officers a detailed description of defendant.

¶ 5    According to Mark Jimenez, a detective with the Rockford police who assisted the postal inspectors, William delivered the parcel at 11:42 a.m. At 11:45 a.m., defendant and another male (his nephew, Antonio Williams) exited the house through the back. Jimenez recognized defendant as the person whom William had described. Defendant stayed on the back deck briefly while talking on the phone. He and Williams then got into a red pickup truck. They

stayed in the stationary truck from 11:45 a.m. to "probably" 12:08 p.m. and then drove away in it, returning two minutes later. Jimenez testified that he was close enough to the truck to hear its engine, but he did not hear the engine being cranked until just before it was driven away. Jimenez saw defendant and Williams leave a second time and return after about 10 minutes. Just before a postal inspector announced that the beacon in the parcel had been triggered, Jimenez saw Williams leave the house alone and walk north on the sidewalk. Jimenez arrested Williams "further down the block on Cedar Street to the west" while most of the other officers were raiding the house.

¶ 6        According to other testimony, the beacon went into alarm mode at about 1:15 p.m. Defendant was then inside; Williams was in the backyard. The officers surrounded the house, with one group going to the front door. At about 1:18 p.m., they announced themselves as police and demanded entry. About 20 seconds later, just as the officers were about to open the door by force, defendant opened the door to them.

¶ 7        The officers searched the house and found no one but defendant inside. They found the parcel upstairs on a bed with both the outer and inner boxes opened. A few items in the bag of toys were displaced, but the package that held the baby wipes and the remaining cocaine was not exposed. The officers found a loaded handgun at the side of the bed in another bedroom and additional ammunition in the closet. They found another handgun concealed in the living room couch. (Both guns had been purchased by defendant's girlfriend, Betsy Caviness, who had a valid FOID card, but the officers did not learn that until later.) Clothing that the officers found in the bedrooms suggested occupancy by multiple people, both male and female. Some of the clothing was defendant's. When the officers searched the kitchen, they found a digital cooking scale in its box, latex gloves, nine boxes of small plastic bags, and a heat sealer. On testing, the scale proved to have a cocaine-containing "powder residue *** under the glass weighing area and also on the number[ ] keys."

¶ 8        Defendant spoke to officers at the scene. He told them that he and Williams were downstairs when he opened the parcel and that he had opened it about half an hour before the officers arrived. After this brief interview at the house, officers took defendant to the Rockford Police Department. In a longer interview there, he told them that his permanent residence was with his sister on Blinn Street but that he often spent nights at 1104 Cedar Street with Caviness. He kept most of his possessions at the Cedar Street house because his sister's boyfriend was a thief; he also sometimes received mail there. The heat sealer was a gift from his mother, but everything else the police discovered belonged to others. He had not known that there was cocaine in the parcel. He had previously received parcels at the house that were addressed to people unknown to him. The last such parcel he had taken to "a mailbox store" and "delivered it to return to sender." This time, he opened the package, but only because "[h]e was curious to see what was inside."

¶ 9        Robert Reffett, a Rockford narcotics detective, testified that cocaine users would rarely possess more than a gram of cocaine at a time. The approximately 150 grams of cocaine delivered to defendant was "a large quantity of cocaine," with a street value of "right around $14,800." The presence of firearms, multiple boxes of sandwich baggies, a heat sealer, latex gloves, and a digital scale were all consistent with the business of breaking up large quantities of cocaine for sale in smaller lots.

¶ 10       Defendant was the sole defense witness. He testified that he "live[d] with Betsy Caviness [on Cedar Street], but [his] personal address [was] at [his] sister's house." "That's the address I

- 3 -

am back and forth in between. That address is my girlfriend's, and my address with—you know, with my belongings there." His daughter, son, and grandson also lived with Caviness. He was the only resident at home late on the morning of April 1, 2015, but "Tony" (Williams) was also present after about 11:10 a.m. He and Williams were close and often spent time together.

¶ 11 Defendant thought that the parcel had been delivered at "11:30, 11:40. Give or take a few minutes." As far as he could tell, the person who delivered it was an ordinary mail carrier. The supposed mail carrier asked him if " 'Jawanna' Sims [*sic*]" lived there, and defendant responded, "[N]obody by that name live here." He knew neither a " 'Jawanna' Sims [*sic*]" nor a "Tamika Sims [*sic*]." He was not expecting a parcel that day and had not known what was in it.

¶ 12 Defense counsel asked defendant why he signed for the parcel if he did not know the addressee. Defendant responded, "The mail carrier said *** you can take this card and have somebody pick it up or either you can take the package right now. I say, 'Well, what do you think?' He says, 'Well, you want to take the package?' I say, 'I don't, but I will.' " Defense counsel asked him if he said anything to the mail carrier about Caviness. Defendant responded, "I told him that she might know the person who the package was going to, I didn't, and I told him that if he wanted to leave it, you know, I will take it."

¶ 13 Defendant took the parcel and put it on a chair in the downstairs den. He and Williams then discussed a car nearby that Williams thought was for sale, which was of interest to the two of them because they sometimes fixed up cars and resold them. Defense counsel asked defendant to describe the departures and arrivals from the house. The following testimony resulted:

"Q. What did you and your nephew do?

A. We got in my sister's truck. We drove down the street because the car was just about a block down the street by the corner. We looked. There was no for sale sign on the car. He said there was. Nobody in the car. We went back down Preston, back down Tate, back down Cedar Street, and pulled back into the driveway.

Q. That was the first time that you left the house; is that correct?

A. Right.

Q. After you went and looked at this car, what did you and your nephew do?

A. Okay. We went back into the house. We come back out. My sister's truck have problem starting. So it wouldn't start for a couple minutes. So we sit in the truck. When we got the truck started, we was headed over towards my mom's house, but my daughter had called me while we was headed that way and said somebody had hit my mom or did something to my mom.

Q. Okay. It was based on that conversation that you and [your] nephew were then headed towards your mom's?

A. Right.

Q. You had mentioned—we heard testimony from Detective Jimenez that at one point you and your nephew were seen seated in the truck for a couple minutes.

A. That's when it wouldn't start.

Q. Ultimately were you able to get the truck to start?

A. Yeah, her truck do that. When you first crank it up in the morning and you drive it, it cuts off, and then it won't start for a while.

Q. So based on your conversation with your sister or your daughter?

A. My daughter.

Q. That somebody hit your mom, you were en route to your mom's?

A. Right.

Q. Did you ever get to your mom's?

A. We didn't make it to my mom's because when my daughter called and said somebody had hit my mom. On en route to my mom's house, I called my mom, and she says, 'Boy, your daughter was just April fooling you.'

Q. Keep in mind this was April 1st?

A. Right.

Q. As an unfortunate joke as that was, you didn't continue to your mom's house?

A. No, I didn't. I called my daughter back and told my daughter she know she was in trouble.

Q. Did you end up then returning to your house?

A. Yes, we did."

Back at the house, they started watching television. Defendant decided to take the parcel upstairs:

"A. When Tony got up to use the bathroom, I got up and grabbed the box out of the chair and took it upstairs and set it on the foot of the bed and come back downstairs and sit on the couch. Tony come out the bathroom then.

Q. Why did you bring the package upstairs?

A. I took it upstairs. I don't even know why I took it upstairs.

Q. No specific reason?

A. Right.

Q. At some point did you open the package?

A. Yes, I did. Tony's brother called him to help him move a car. Tony said he was going to help his brother move this car. When he left—about three, four minutes later after he left, I went upstairs and opened this box.

\* \* \*

Q. Why did you decide to open the box?

A. I was just curious about it.

\* \* \*

Q. When you opened the box, what did you observe?

A. There was another box on the inside that box. Okay? Then I opened that box. When I opened the box that was on the inside of that box, there was a bunch of toys. When I seen the bunch of toys in the box, I said, 'Oh, maybe it's for my granddaughter.' I don't know.

\* \* \*

Q. What did you do at that point then after seeing these toys?

A. *** I left the bedroom, threw some toilet paper in the bathroom garbage, and walked back down the steps.

Q. And when you were downstairs what, if anything, occurred?

A. When I got to the bottom of the steps, there was a big like boom, and I say what the, and then I went to the front door. When I got *** to the front door there was another big boom as I was opening the door up. There was about 17, 18 guys out there with pistols. I'm trying to keep from being shot."

¶ 14    On cross-examination, the State asked defendant if he recalled telling Lupiani that he "opened the package a half hour after it had been delivered to [the] residence in the presence of [Williams] in the downstairs room." Defendant denied having said that he opened it in Williams's presence, but he also explained that the police had "come in about four minutes after [he] opened the box." Defendant further denied knowing that there were handguns in the house and insisted that he learned that the guns belonged to Caviness when one of the officers mentioned it while they were still at the house. The State also questioned him about the second time he left the house after the parcel arrived:

"Q. And it is your testimony that you were going to go have lunch at that point?

A. Nope, we wasn't going to have lunch. We were headed towards my mom's car when I got a call from my daughter. When my daughter called me, she was telling me that somebody had hit my mom. We were headed towards my mom's house.

Q. When did you get the call from your daughter that your mom had been hit?

A. When me and Tony left the house, probably when we got to the stop sign.

Q. Okay. You had already decided to leave the house at that point?

A. Yeah.

Q. You returned to the residence?

A. Yes, I did."

The State then returned to questions of the interval between defendant's opening of the parcel and the execution of the warrant:

"Q. Okay. Do you recall telling Inspector Lupiani and Detective Jimenez that you opened up that package approximately a half hour after it had been delivered by the mailman?

A. I recall telling them I opened up that box probably about 30 minutes after they came—well, about four minutes after they came in. When I opened the box, they come in about four or five minutes.

Q. Okay. You didn't tell them you opened it [a] half hour afterwards. Is that your testimony?

A. I didn't tell them—yeah, I told them that I opened it a half hour after, but they had me sitting in a chair in the dinning [sic] room—in the den, the chair in the den, after they came in for about 20, 25 minutes. I didn't have no time.

Q. It's your testimony that what you were referring to was the half hour after the officers entered the house. That's what you're saying to me?

A. Right. They come in about four or five minutes—"

¶ 15    Lupiani and Jimenez testified as rebuttal witnesses. Lupiani recalled that, almost immediately after detaining defendant, he started questioning him about when the parcel was

opened. He asked the question several times, and each time defendant said that it was opened half an hour before the officers knocked on the door. Further, defendant described the same timing when Lupiani and Jimenez questioned him at the police station. Lupiani also testified that the officers did not learn until after they left the house that the firearms belonged to Caviness. Thus, contrary to what defendant testified, he could not have learned who owned them from the officers at the scene. Jimenez testified that, during the later interview, while Lupiani was not present, defendant repeated his assertion that he had opened the parcel half an hour before the officers executed the warrant.

¶ 16     The jury found defendant guilty. Its deliberations were uneventful except that it requested to hear the recording of William's conversation with defendant again. (With the parties' agreement, the court replayed the recording.)

¶ 17     Defendant filed a posttrial motion in which he asserted, among other things, that the State's evidence was insufficient. The court denied the motion and sentenced defendant to 12 years' imprisonment. Defendant timely appealed.

¶ 18                                    II. ANALYSIS

¶ 19     On appeal, defendant argues that the State failed to prove beyond a reasonable doubt his knowledge of the parcel's contents. See, *e.g.*, *People v. Fleming*, 2013 IL App (1st) 120386, ¶ 72 (a defendant's knowledge of the presence of the drugs is an element of the offense of possession of a controlled substance with intent to deliver). He contends that his testimony that he did not know about the cocaine, combined with the evidence that, despite opening the parcel, he did not expose the cocaine, precluded a sustainable guilty verdict.

¶ 20     The State responds that defendant's acceptance and opening of the parcel when he claimed not to know the addressee provided strong circumstantial evidence that he knew what was in it. The State further argues that defendant's having immediately lied, telling the officers that he opened the parcel earlier than he did, showed that he knew that the parcel's contents were a problem for him without his ever having seen the cocaine. Responding to the details of defendant's argument, the State suggests that defendant did not open the internal package containing the cocaine only because he did not have enough time to get through all the layers of wrapping before the officers came to the door.

¶ 21     In reply, defendant points out that, not only did he not open the package that contained the cocaine, he did not even pull it out of the parcel. He suggests that this supports his testimony that his curiosity was satisfied when he saw that the parcel contained toys.

¶ 22     We hold that the evidence of defendant's knowledge was sufficient to sustain the verdict. We review the sufficiency of the evidence under the familiar standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985): when a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). Although we must accord great deference to the fact finder's decision whether to credit specific testimony, the fact finder's decision is not conclusive. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 23 Defendant challenges the sufficiency of the State's proof of the charged offense's knowledge element; he argues that the State failed to show that he knew that the parcel contained cocaine. The State generally must prove knowledge of this kind by circumstantial evidence, as it is not susceptible to direct proof. *E.g. People v. Hodogbey*, 306 Ill. App. 3d 555, 559-60 (1999). Circumstantial evidence alone can be sufficient to prove a necessary element beyond a reasonable doubt. See, *e.g.*, *Fleming*, 2013 IL App (1st) 120386, ¶ 74.

¶ 24 Defendant argues that his behavior after receiving the parcel was inconsistent with his knowledge that the parcel contained contraband:

"In this case, defendant initially expressed reluctance to sign for the package because it was not addressed to anyone living in the house. *** Believing the package may have been destined for his girlfriend, defendant decided to sign for the package. Out of curiosity, he opened the package to see what was inside. When he opened the box and saw toys laying [*sic*] on top of the bag, he looked no further. Defendant did not see or touch the secreted cocaine. *** This evidence shows defendant innocently signed for and looked inside the package. This evidence is also consistent with defendant's claim that he did not know that cocaine was in the package. *** Therefore, the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt."

¶ 25 This argument is unpersuasive. In evaluating the sufficiency of the evidence, we consider the evidence from the whole trial. Defendant is correct that the State's case would have gained strength if the evidence had shown that he rushed to expose the cocaine-containing package. That he left that package unexposed is thus some evidence to suggest his lack of knowledge. However, that bit of evidence in his favor does not so outweigh the evidence against him as to preclude proof beyond a reasonable doubt of the offense's knowledge element.

¶ 26 In its case-in-chief, the State showed that defendant behaved in a way that was implausible for a person who did not know what the parcel contained. Mere innocent curiosity is not an adequate explanation for defendant's opening of a parcel addressed to someone unknown to him. To be sure, one can imagine that defendant might have acted to exercise control over Caviness and the children or to satisfy some form of suspicion. But no evidence suggested that any such alternative explanation was likely. Moreover, considering that defendant lied about when he opened the parcel and that he lived in the presence of supplies and materials useful in the drug trade, such other explanations would have been unconvincing even if defendant had given them.

¶ 27 In addition, the fact that the officers arrived at defendant's door only minutes after he triggered the alarm weakens the inference that he urges—that he left the cocaine in the unexposed box under the toys because he did not know that it was there. The State's photographic exhibits show that both the outer and inner boxes were closed with filament tape. Thus, the strongest inference is that he simply had not had enough time to expose the cocaine. Indeed, to refute this inference was the only plausible reason why defendant would have falsely claimed that he opened the parcel earlier.

¶ 28 Looking beyond the State's case-in-chief, we conclude that defendant's own testimony only added to the circumstantial evidence in the State's favor. When a defendant elects to testify to explain inculpatory circumstances, the trier of fact may weigh any inconsistencies or implausibilities in that testimony against the defendant. See, *e.g.*, *People v. Nyberg*, 275 Ill. App. 3d 570, 579 (1995) ("When a defendant elects to explain the circumstances of a crime, he

is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies."). Defendant's explanations for his two departures from the house were implausible, especially in combination. Defendant claimed that each departure was the result of someone misleading him. He testified that he and Williams drove away from the house the first time because Williams had told him that a car "a block down the street" had a "for sale" sign on it. But Williams had made a mistake; there was no sign. And defendant testified that he and Williams drove away from the house the second time because his daughter had told him that someone had hit his mother. But his daughter was pulling an April Fools' prank on him; she had completely fabricated the incident.

¶ 29        Further, defendant's explanation for the time he and Williams spent sitting in the truck made little sense. Defendant claimed that, although the truck started without difficulty the first time, he had to wait "a couple minutes" to get it to go the second time; he could not explain why the nearby surveillance officer could not hear him trying to start the truck. And defendant, despite implying that he was a skilled part-time mechanic, lacked any specific explanation for the truck's behavior. Also, although people do drive short distances, it is odd that defendant would drive the truck a few blocks if he knew, as he testified, that by doing so he would make it hard to start if he needed it again.

¶ 30        Further still, despite defendant's having to wait to get the truck started, he claimed that he did not think to call his mother, and thus learn of the prank, until he was on his way there. He claimed that this explained a second round-trip through his neighborhood not long after the package arrived. Based on all this, the jury could reasonably conclude that defendant was lying about his two trips and, based on that inference, could further infer that he was actually engaged in countersurveillance. The jury was free to add that inference to the circumstantial evidence of defendant's knowledge from the State's case-in-chief. The combined evidence gave the jury a more-than-adequate basis to conclude that defendant knew that the cocaine was in the parcel, even if he did not rush to dig it out.

¶ 31        Defendant relies on *Hodogbey* to suggest that we may not properly consider his testimony in deciding whether the State met its burden of proof. Although *Hodogbey* supports defendant's position, we nevertheless disagree. The *Hodogbey* court, addressing a case with many factual commonalities with this one, stated as follows:

> "Because the burden of proof never shifts, a reasonable doubt is created by the insufficiency of the evidence *introduced* by the State. *People v. Coulson*, 13 Ill. 2d 290, 296 *** (1958). Indeed, [i]f a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case. [Citations.]" (Emphasis added and internal quotation marks omitted.) *Hodogbey*, 306 Ill. App. 3d at 561.

The *Hodogbey* court therefore held that, in deciding the sufficiency of the State's evidence, it could not weigh in the State's favor the negative inferences that the jury might have drawn if it concluded that the defendant had testified falsely. In so holding, the *Hodogbey* court incorrectly extended the holding of *Coulson*. Per *Coulson*, "it is the insufficiency of *the People's evidence* which creates [reasonable] doubt. If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case." (Emphasis added.) *Coulson*, 13 Ill. 2d at 296. The "People's evidence" (*Coulson*, 13 Ill. 2d at 296) is not solely "the evidence introduced by the State" (*Hodogbey*, 306 Ill. App. 3d at 561). *Hodogbey* aside, even as Illinois cases consistently recognize that the overall burden of proof

never shifts from the State, they also consistently recognize that a trier of fact may draw negative inferences when a defendant chooses to testify and gives an implausible explanation for his or her behavior. This court's decision in *People v. Irby*, 237 Ill. App. 3d 38, 66 (1992), is typical:

> "A conviction must rest on the strength of the State's case, not the weakness of defendant's case. [Citation.] However, when a defendant elects to explain the circumstances of what occurred, he is bound to tell a reasonable story or be judged by its improbabilities."

¶ 32    To be sure, a rule that a guilty verdict could be sustained solely by assuming that the trier of fact drew a negative inference because it deemed a witness incredible might force a defendant to choose between an active defense and a meaningful appeal: "[i]f negative inferences, based on demeanor evidence, were adequate in themselves to satisfy a rational juror of guilt beyond a reasonable doubt, appellate courts might not be able to provide meaningful review of the sufficiency of evidence." *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991). The State generally should not be able to succeed on appeal by claiming that it adequately proved an element merely because the defendant testified to deny the element and the jury might have disbelieved him or her on that point. But that is not what is at issue here. Here, we need not resort to assumptions about defendant's demeanor to recognize that his testimony was partly implausible. That implausibility was positive evidence favoring the State, and when we consider the sufficiency of the evidence as a whole, we may weigh that implausibility in the State's favor.

¶ 33    Although we disagree with the reasoning of *Hodogbey*, we also note that it is factually distinguishable, as are the cases on which it relies. As we noted, *Hodogbey* had many factual commonalities with the case here, but it also had a critical difference: the defendant in *Hodogbey* signed for a package that contained heroin but never opened it. *Hodogbey*, 306 Ill. App. 3d at 557. Similarly, two Pennsylvania cases that the *Hodogbey* court treated as persuasive authority favoring reversal, *Commonwealth v. Sterling*, 361 A.2d 799, 801 (Pa. Super. Ct. 1976),[1] and *Commonwealth v. Rambo*, 412 A.2d 535, 536-37 (Pa. 1980), involved unopened parcels of contraband. As we suggested above, people ordinarily do not open packages that are not addressed to them. In light of all the circumstances, defendant's accepting *and opening* of the parcel addressed to the unknown "Tamika Simms" was sufficiently unusual that the jury could properly infer that defendant knew that the parcel was in fact for him.

¶ 34                                        III. CONCLUSION

¶ 35    For the reasons stated, we hold that the State's evidence was sufficient for a reasonable jury to conclude that defendant knew that the parcel contained cocaine. We therefore affirm defendant's conviction. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v.*

---

[1] The inferences at issue in *Sterling* are dissimilar to those here. The defendant in *Sterling* told officers that he was suspicious that a parcel sent to his house did contain drugs and said that he had "no intention" of opening it. *Sterling*, 361 A.2d at 801. That case thus turned largely on whether the defendant had declined to exercise dominion over the contraband and not on whether the defendant knew of the drugs' presence.

*Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 36        Affirmed.